Matthew Eric **WRINKLES**,
Appellant–Petitioner,

v.

**STATE of Indiana, Appellee–Respondent.**

No. 82S00–9803–PD–170.

Supreme Court of Indiana.

June 29, 2001.

Susan K. Carpenter, Public Defender of Indiana, Joanna Green, Deputy Public Defender, Laura L. Volk, Deputy Public Defender, Linda Hughes, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Thomas D. Perkins, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

RUCKER, Justice.

After a trial by jury, Matthew Eric Wrinkles was convicted of three counts of murder in the shooting deaths of his wife Debbie Wrinkles, his brother-in-law Mark Fulkerson, and his sister-in-law Natalie Fulkerson. Following the jury's recommendation, the trial court sentenced him to death. We affirmed his convictions and sentence on direct appeal. *See Wrinkles v. State*, 690 N.E.2d 1156 (Ind.1997). Thereafter, Wrinkles filed a petition for post-conviction relief and now appeals the denial of that petition raising several issues for our review, which we consolidate and rephrase as follows: (1) did Wrinkles receive ineffective assistance of trial counsel during the guilt, penalty, and sentencing phases of trial; and (2) did Wrinkles receive ineffective assistance of appellate counsel.

We affirm the post-conviction court's denial of Wrinkles' petition for post-conviction relief.

**Factual and Procedural Background**

In June 1994, Wrinkles' wife Debbie and the couple's two children, Lindsay and Seth, moved into the Evansville home of Mark and Natalie Fulkerson, Debbie's brother and sister-in-law. Wrinkles filed for divorce on June 30, 1994, and Debbie obtained a protective order that same day prohibiting Wrinkles from having any contact with her and the children.

At a provisional divorce hearing on July 20, 1994, Debbie agreed to a rescission of the protective order, and Wrinkles and Debbie agreed that Debbie would retain

custody of the children but Wrinkles would have reasonable visitation rights. Wrinkles and Debbie agreed to meet later that day at a local fast food restaurant so that Wrinkles could see his children, whom he had not seen in over a month. However, Debbie and the children never showed up. Wrinkles called his divorce attorney, who told him that although nothing could be done that night because the courts were closed, he would take care of it tomorrow. Wrinkles, still frustrated, called the Fulkerson home to speak with Debbie, but she was not there. When Debbie returned later that night, she called Wrinkles to set up a meeting for the next day, but there was no answer.

Around 2 a.m. on July 21, 1994, Wrinkles parked his truck a block away from the Fulkerson home, put on camouflage clothing, painted his face, and armed himself with a .357 magnum revolver and a knife. He then climbed over a fence into the Fulkersons' backyard, cut the telephone wires, and kicked in the back door. Wrinkles first approached Mark in his bedroom, shooting him four times in the presence of his three-year-old son. Awakened by the gunshots, Debbie entered the bedroom hallway and saw that Wrinkles had shot her brother. Debbie, who had already grabbed her gun for protection, shot Wrinkles in the arm and then fell to the floor. Lindsay, also awakened by the gunshots, entered the bedroom hallway and, upon seeing her father about to shoot her mother, pleaded, "Dad, please don't shoot Mom." R. at 2090.[1] Wrinkles responded "shut up" and then shot Debbie in

the chest. R. at 2091. In the meantime, Natalie ran out the front door. Wrinkles followed Natalie onto the front porch and shot her in the face at close range. Subsequent autopsies revealed that Mark, Debbie, and Natalie each died from gunshot wounds.

■ Police apprehended Wrinkles later that morning in Warrick County. The State charged Wrinkles with three counts of murder that same day and filed a notice of its intent to seek the death penalty on July 28, 1994. The trial court appointed salaried, part-time public defenders Dennis Vowels and Michael Danks to represent Wrinkles. The trial was held on May 15–19, 1995. The defense theory at trial was that because of a combination of Debbie depriving Wrinkles of access to his children and his methamphetamine addiction, Wrinkles broke into the Fulkerson home to get his children and shot the victims only after Debbie shot him and the other victims pointed guns at him. The jury found him guilty as charged. The penalty phase was held on May 20, 1995, and the jury returned a recommendation of death. A month later, the trial court, finding that the multiple murder aggravator[2] outweighed the mitigators, imposed the death penalty. Wrinkles appealed his convictions and sentence, and we affirmed. *Wrinkles v. State*, 690 N.E.2d 1156 (Ind. 1997). Wrinkles then filed a petition for post-conviction relief, which the post-conviction court denied. This appeal ensued.

■ Wrinkles raises several issues in this appeal, most of which are either

---

**1.** "R." refers to the trial court record, and "P–C R." refers to the post-conviction court record.

**2.** The multiple murder aggravator requires that "[t]he defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other

murder." Ind.Code § 35–50–2–9(b)(8). This subsection is considered in cases involving double or multiple murders for which the defendant is being tried in one proceeding. *Pope v. State*, 737 N.E.2d 374, 381 n. 4 (Ind. 2000) (citing *Hough v. State*, 560 N.E.2d 511, 519 (Ind.1990)).

waived or are subject to the doctrine of res judicata.[3] We address the merits of those that remain: (1) did Wrinkles receive ineffective assistance of trial counsel during the guilt, penalty, and sentencing phases of trial; and (2) did Wrinkles receive ineffective assistance of appellate counsel.

## Standard of Review for Post–Conviction

 Post-conviction procedures do not afford the convicted an opportunity for a "super-appeal." *Ben–Yisrayl v. State,* 729 N.E.2d 102, 105 (Ind.2000), *reh'g denied, petition for cert. filed,* —— U.S.L.W. —— (U.S. Mar. 14, 2001) (No. 00–9185).

Rather, they create a narrow remedy for subsequent collateral challenges to convictions which must be based on grounds enumerated in the post-conviction rules. *Id.; Williams v. State,* 724 N.E.2d 1070, 1076 (Ind.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 886, 148 L.Ed.2d 793 (2001). Petitioners must establish their grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5). A petitioner who has been denied post-conviction relief appeals from a negative judgment. *Prowell v. State,* 741 N.E.2d 704, 708 (Ind.2001). Therefore, the petitioner must convince the court that the evidence as a whole leads unerringly

---

3. Claims that are available, but not presented, on direct appeal are waived for post-conviction review unless the claimed error is fundamental. *Conner v. State,* 711 N.E.2d 1238, 1246 (Ind.1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000). In order to avoid waiver, Wrinkles argues that the following "freestanding" issues represent fundamental error: (1) did the trial court err in forcing him to wear a stun belt without establishing a need for it on the record; and (2) did the prosecutor commit prosecutorial misconduct? However, in order to demonstrate fundamental error in a post-conviction proceeding, a defendant must persuade the court, by a preponderance of the evidence, that a violation of basic principles of law caused the defendant's conviction or sentence to be invalid. *Id.* As for issue (1), Wrinkles merely says "[t]his issue is available on post-conviction. Use of the shock belt constitutes fundamental error...." Br. of Appellant at 22. As for issue (2), Wrinkles proclaims "[t]he State misconduct here, individually and/or cumulatively, constituted fundamental error." Br. of Appellant at 81. Post-conviction procedures do not provide a petitioner with an opportunity to present freestanding claims that contend the original trial court committed error. *Lambert v. State,* 743 N.E.2d 719, 726 (Ind.2001). In this case, Wrinkles has failed to meet the standard required to demonstrate fundamental error. The issues he contends are available for review as freestanding claims are waived.

Wrinkles also argues that issue (1) is available for post-conviction review. He asserts

that it was unknown and unavailable on direct appeal because there was nothing in the record indicating that Wrinkles wore a stun belt during trial. To the contrary, as even Wrinkles points out, "The shock belt vibrated once during trial," Br. of Appellant at 21, at which point attorney Danks asked for a recess. After it was determined that the batteries were low, the batteries were replaced, and the trial resumed. P–C R. at 1142–44. Further, attorney Danks was co-counsel on Wrinkles' direct appeal. Therefore, he had knowledge about the use of the stun belt.

Lastly, Wrinkles contends on post-conviction that his death sentence constitutes "cruel and unusual punishment" because of "unfair and unreliable sentencing procedures." Br. of Appellant at 96. We reviewed Wrinkles' death sentence on direct appeal and found it to be appropriate. *Wrinkles,* 690 N.E.2d at 1173. To the extent Wrinkles now seeks to relitigate the appropriateness of his death sentence, his claim is barred by res judicata. *See State v. Holmes,* 728 N.E.2d 164, 168 (Ind. 2000) (stating that as a general rule, when this Court decides an issue on direct appeal, the doctrine of res judicata applies, thereby precluding its review in post-conviction proceedings), *cert. denied,* —— U.S. ——, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001). To the extent Wrinkles challenges his sentence on grounds not presented on direct appeal, he has waived his challenge. In this appeal, we address only those claims raised in the context of ineffective assistance of counsel.

and unmistakably to a decision opposite that reached by the post-conviction court. *Id.; Ben–Yisrayl,* 729 N.E.2d at 106. Stated differently, "[t]his Court will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion." *Miller v. State,* 702 N.E.2d 1053, 1058 (Ind.1998).

▮ In the present case, the post-conviction court entered findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule 1(6). A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made. *Prowell,* 741 N.E.2d at 708; *Ben–Yisrayl,* 729 N.E.2d at 106. Wrinkles, however, argues that we should apply the clearly erroneous standard "with a little more bite" because the post-conviction court's findings of facts and conclusions of law are a virtually verbatim copy of those proposed by the State. Reply Br. of Appellant at 2 (quotation omitted). We recently addressed a trial court's wholesale adoption of a party's findings of fact and conclusions of law in *Prowell:*

> It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority of our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings. But when this occurs, there is

an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court. This is particularly true when the issues in the case turn less on the credibility of witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony.

*Prowell,* 741 N.E.2d at 708–09. Although we reiterate the foregoing concerns here, we decline Wrinkles' invitation to modify our standard of review.

### Standard of Review for Ineffective Assistance of Counsel

▮ To establish a post-conviction claim alleging violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish before the post-conviction court the two components set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). First, a defendant must show that counsel's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. This requires showing that counsel's representation fell below an objective standard of reasonableness and that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed to the defendant by the Sixth Amendment. *Id.* at 687–88, 104 S.Ct. 2052. Second, a defendant must show that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. *Id.* at 694, 104 S.Ct. 2052. A reasonable probability

is a probability sufficient to undermine confidence in the outcome. *Id.*

 Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. *Ben–Yisrayl,* 729 N.E.2d at 106. Counsel's poor trial strategy, bad tactics, a mistake, carelessness, or inexperience do not necessarily amount to ineffective assistance of counsel. *Carr v. State,* 728 N.E.2d 125, 131 (Ind.2000).

## I. Ineffective Assistance of Trial Counsel

### A. Failure Adequately to Investigate, Develop, and Present an Insanity Defense

 Wrinkles first contended before the post-conviction court that counsel were ineffective for not adequately investigating, developing, and presenting an insanity defense. Wrinkles asserts that if counsel had presented an insanity defense, the jury would have found him guilty but mentally ill and consequently it would not have recommended, and the trial court would not have imposed, the death penalty.

Attorney Vowels testified at the post-conviction hearing that their guilt phase theory was:

> That [Wrinkles] had been deprived access to his children, that he was manipulated by his deceased wife away from seeing his kids, that she had marshalled [sic] her family in support of her efforts to keep Mr. Wrinkles away from his children, that there had been arrangements made in a recent domestic relations hearing for him to be around his kids, that she had violated the intent and spirit of that agreement, which has happened just a very short time before her death, that he was a frustrated man who had no control over access to his chil-

> dren, that he went off, that it just got to be too much for him.

P–C R. at 1205. Attorney Danks supplemented this theory at the post-conviction hearing: "Wrinkles was shot first, was wounded and then however else the shootings occurred was a result of him being wounded." P–C R. at 1044.

In addition to this basic theory, counsel presented the trial testimony of neuropsychologist Dr. Eric Engum. Dr. Engum evaluated Wrinkles on April 4–5, 1995. On these days, Dr. Engum spent approximately thirteen hours with Wrinkles and performed a battery of psychological tests that included objective psychological testing, neuropsychological testing, and a subjective personality assessment. R. at 2989, 2990–91. Dr. Engum diagnosed Wrinkles with severe Mixed Personality Disorder, Delusional Disorder which became increasingly acute in the last sixty or ninety days before the shootings, amphetamine dependence with the likelihood of amphetamine-induced psychotic disorder with delusions, cannabis dependence, and alcohol dependence—all of which are recognized mental illnesses. R. at 2994–96. Dr. Engum elaborated that people who are highly dependent on methamphetamine, such as Wrinkles who used methamphetamine on a daily basis for ten years, "become very agitated, extremely restless, they don't sleep well, they're easily angered, they have very low frustration tolerance—the slightest thing will set them off. They also develop [a] very highly attuned sense of suspiciousness and paranoia." R. at 2995, 3008. Dr. Engum ultimately concluded that although Wrinkles' judgment was substantially impaired at the time of the shootings, he was sane; that is, Wrinkles knew what he was doing and could conform his conduct to the requirements of the law. R. at 2997.

Despite counsels' theory and Dr. Engum's testimony, Wrinkles contends that counsel should have presented an insanity defense for primarily two reasons. First, Wrinkles argues that counsels' theory rings of self-defense, which requires a defendant to be in a place where he had the right to be. Wrinkles asserts that because he broke into the Fulkerson home, he was not in a place where he had the right to be; therefore, self-defense was not legally viable.

 It is true that counsels' theory could not have completely exonerated Wrinkles. However, counsel could have employed it in an attempt to avoid murder convictions and the death penalty. There is no requirement that a theory must have the potential to completely exonerate a defendant before it can be used without ineffective assistance of counsel implications. *See Allen v. State,* 686 N.E.2d 760, 778 (Ind.1997) (finding no ineffective assistance where defense counsel's theory was not completely to exonerate defendant but to avoid murder conviction and death penalty in favor of conviction for voluntary manslaughter).

Second, Wrinkles claims that contrary to Dr. Engum's conclusion, he was indeed insane at the time of the shootings because of methamphetamine-induced psychosis. Wrinkles relies on the post-conviction testimony of toxicologist Dr. Michael Evans and clinical psychologist Dr. Robert Smith. Dr. Evans, who did not interview Wrinkles, testified that methamphetamine is the strongest drug in terms of addiction, it produces paranoia and violence, and long-term use can cause genetic changes in the brain. P–C R. at 2495, 2497, 2507. Dr. Evans then concluded that based on hair samples taken from Wrinkles three weeks after the shootings, Wrinkles was addicted to methamphetamine at the time of the shootings. P–C R. at 2509. Dr. Smith testified that based on tests performed on Wrinkles approximately five years after the shootings, Wrinkles was insane at the time of the shootings because of methamphetamine-induced psychosis. P–C R. at 2567, 2582, 2583.

Although Dr. Evans elaborated more on the adverse effects of methamphetamine use in his post-conviction testimony than Dr. Engum did in his trial testimony, Dr. Engum and Dr. Evans both concluded that Wrinkles was addicted to methamphetamine at the time of the shootings. Similarly, Dr. Engum and Dr. Smith both diagnosed Wrinkles with methamphetamine-induced psychosis; their only point of disagreement concerned Wrinkles' sanity at the time of the shootings. Here, Wrinkles has shown only that two experts came to different conclusions—a fact that can hardly be said to form the basis for an ineffective assistance claim.

In addition, although not officially presenting an insanity defense, counsel presented evidence of Wrinkles' methamphetamine addiction and its role in the shootings throughout trial. They presented it during opening statement, R. at 1824; through four lay witnesses, R. at 2834, 2843, 2861–62, 2931–32, 2935–37; through Dr. Engum, R. at 2994–97, 3002, 3006–07; through Wrinkles, R. at 2711–12, 2715, 2720, 2722–23; and during closing argument, R. at 3141, 3143.

In fact, attorney Vowels testified at the post-conviction hearing that counsel did not want to introduce significant evidence of Wrinkles' methamphetamine use because they thought it would "put an additional layer of bad" on Wrinkles and make him appear as a "heavy doper." P–C R. at 1211, 1320. Attorney Danks testified at the post-conviction hearing that it was a tactical decision not to put on more evidence about Wrinkles' methamphetamine

use because they thought it would be more harmful than helpful. P–C R. at 1145.

■ Counsel is given significant deference in choosing a strategy which, at the time and under the circumstances, he or she deems best. *Potter v. State,* 684 N.E.2d 1127, 1133 (Ind.1997); *see also Conner,* 711 N.E.2d at 1248 ("Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference."); *State v. Moore,* 678 N.E.2d 1258, 1261 (Ind.1997) ("[A]lthough egregious errors may be grounds for reversal, we do not second-guess strategic decisions requiring reasonable professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests."). Such is the case here. We cannot say that the post-conviction court erred in concluding that counsel were not ineffective for failing to present an insanity defense when (i) their own trial expert concluded that Wrinkles was sane at the time of the shootings; (ii) counsel presented evidence of Wrinkles' methamphetamine addiction and its role in the shootings throughout trial; and (iii) counsel stated that it was a tactical decision not to take his addiction any farther. *See Holmes,* 728 N.E.2d at 172 (finding that counsel was not ineffective for not presenting evidence regarding the defendant's mental ability to plan and carry out the crime when counsel introduced evidence of the defendant's mental illnesses at trial).

### B. Inadequate Preparation of Defense Witnesses

■ Wrinkles asserted before the post-conviction court that counsel were ineffective because they failed adequately to prepare him and Dr. Engum for their trial testimony. In support of this contention, Wrinkles relies exclusively on a discrepancy between his and Dr. Engum's trial testimony concerning the sequence in which the victims were shot. Wrinkles testified that he shot Debbie, Mark, and then Natalie. R. at 2730–32. However, Dr. Engum testified that Wrinkles told him during the April 1995 evaluation that he shot Natalie, Mark, and then Debbie. R. at 3075. Wrinkles seems to argue that if counsel had adequately prepared him and Dr. Engum, they would have been aware of this discrepancy and therefore they would have presented only one sequence of the shootings at trial. Not having done so, Wrinkles alleges that his and counsels' credibility was destroyed.

Wrinkles' argument is not persuasive. Attorney Danks, who examined Wrinkles at trial, testified at the post-conviction hearing that he prepared Wrinkles by talking with him about his testimony and about the defense theory of the case. P–C R. at 1043. Attorney Vowels testified that he engaged in role-play with Wrinkles before trial. P–C R. at 1204. Attorney Danks' billing records reflect that he spent approximately 19.75 hours consulting with Wrinkles prior to trial, including 5.5 hours the day before voir dire started, P–C R. at 1162–68, while attorney Vowels' billing records show that he spent 33.5 hours consulting with Wrinkles prior to trial, also including 5.5 hours the day before voir dire started, P–C R. at 1296–1310.

Attorney Danks, who also examined Dr. Engum at trial, testified at the post-conviction hearing that he went over Dr. Engum's testimony with him. P–C R. at 1044. In like fashion, Attorney Vowels also testified that he discussed Dr. Engum's testimony with him. P–C R. at 1203. Counsels' billing records support their testimony: attorney Danks' billing records reflect that he spent 4.25 hours consulting with Dr. Engum before trial, including 1.5 hours the day before Dr. Engum testified, P–C R. at 1166, 1167, while attorney Vowels' billing records

show that he spent 3.5 hours consulting with Dr. Engum before trial, P–C R. at 1307, 1309, 1310.

Wrinkles' real argument seems to be that counsel found out "too late" about the discrepancy and therefore their "desperate attempt to fix the problem" was not sufficient. Reply Br. of Appellant at 9. The record shows that counsel were aware of the two sequences of the shootings—at the very least, the night before Dr. Engum testified. R. at 3071–72. Consequently, Dr. Engum did not testify on direct examination about the sequence of the shootings about which Wrinkles told him during the April 1995 evaluation. However, this information came out on cross-examination. R. at 3071. Dr. Engum then gave a possible explanation for the discrepancy. R. at 3078–79. He testified that Wrinkles' recollection of the sequence of the shootings may have been impaired by methamphetamine and alcohol. R. at 3076, 3078, 3080. Further, Dr. Engum explained that he was hired as an expert to diagnose Wrinkles and evaluate his state of mind at the time of the shootings—not to testify on behalf of the defense as a factual witness regarding the sequence of the shootings. R. at 3076–77. Counsels' performance was not deficient.

■■■ Even assuming counsels' performance was deficient, Wrinkles has failed to show prejudice. Basically, the discrepancy in Wrinkles' and Dr. Engum's testimony amounts to a difference between Wrinkles admitting that he shot the victims in one order as opposed to another. It does not change the fact that Wrinkles dressed in camouflage, painted his face, armed himself, cut the phone lines, broke into the Fulkerson home, and shot and killed his wife, brother-in-law, and sister-in-law. The post-conviction court did not err in concluding that counsel were not ineffective on this basis.

### C. Failure to Object

■■■ Wrinkles alleged before the post-conviction court that counsel acted deficiently by not objecting to various statements made by witnesses and to various evidence proffered by the State. In order to prove ineffective assistance of counsel due to the failure to object, a defendant must prove that an objection would have been sustained if made and that he was prejudiced by the failure. *Timberlake v. State,* 690 N.E.2d 243, 259 (Ind.1997). The alleged instances can be summarized as follows: (1) the trial court required Wrinkles to wear a stun belt during trial without establishing a need for it on the record; (2) the victim impact statement which was contained in the Pre-sentence Investigation Report; (3) evidence of Wrinkles' prior bad acts; (4) the prosecutor's comments about Wrinkles during closing argument; (5) the testimony of Debbie White, a State's witness whose name was not provided to counsel prior to trial; and (6) admission of the murder weapon.

### (1) Stun Belt

Wrinkles contends that counsel were ineffective for not objecting when the trial court ordered him to wear a stun belt during trial because the trial court did not place the reasons supporting the use of the stun belt on the record and no such reasons even existed. Wrinkles asserts that utilization of the stun belt, which was conspicuous to at least seven jurors, undermined [his] presumption of innocence and made him appear dangerous and uncontrollable in front of the jurors who would help decide whether he would live or die. Br. of Appellant at 29; Reply Br. of Appellant at 11. He claims that at the very least he is entitled to a new penalty phase of trial.

A defendant has the right to appear in front of a jury without physical restraints, unless such restraints are necessary to prevent the defendant's escape, to protect those present in the courtroom, or to maintain order during trial. *Bivins v. State,* 642 N.E.2d 928, 936 (Ind.1994). This right springs from the basic principle of American jurisprudence that a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt. *Sweet v. State,* 498 N.E.2d 924, 929 (Ind.1986), *superceded on other grounds by* Ind. Evidence Rule 404; *see also Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). For this presumption to be effective, courts must guard against practices that unnecessarily mark the defendant as a dangerous character or suggest that his guilt is a foregone conclusion. *Sweet,* 498 N.E.2d at 929; *see also Holbrook,* 475 U.S. at 567–68, 106 S.Ct. 1340; *Estelle,* 425 U.S. at 503, 96 S.Ct. 1691. As such, "the facts and reasoning supporting the trial judge's determination that restraints are necessary must be placed on the record." *Coates v. State,* 487 N.E.2d 167, 169 (Ind.Ct.App. 1985), *overruled on other grounds by Hahn v. State,* 533 N.E.2d 618 (Ind.Ct. App.1989); *see also Roche v. State,* 690 N.E.2d 1115, 1123 (Ind.1997) ("[T]he trial court should have made a record of the reasons for requiring the restraints...."), *habeas corpus conditionally granted by Roche v. Anderson,* 132 F.Supp.2d 688 (N.D.Ind.2001).

Typical methods of restraint include handcuffs, shackles, security chairs, and gagging a defendant. *See James v. State,* 716 N.E.2d 935, 941 (Ind.1999); *Kindred v. State,* 540 N.E.2d 1161, 1179 (Ind.1989); *Avant v. State,* 528 N.E.2d 74, 77–78 (Ind. 1988); *see also Illinois v. Allen,* 397 U.S. 337, 343–44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ("We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant [ ]: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."). A more recent form of restraint is the stun belt.

The stun belt, also known as the REACT (Remote Electronic Activated Control Technology) security belt, is an electronic shocking device that is secured around the wearer's waist. Shelley A. Nieto Dahlberg, Comment, *The REACT Security Belt: Stunning Prisoners and Human Rights Groups into Questioning Whether its Use is Permissible under the United States and Texas Constitutions,* 30 St. Mary's L.J. 239, 246 (1998). It was first introduced into the criminal justice system in the early 1990's. *Id.* Developers of the belt promote it as an alternative to using leg-irons or shackles when transporting potentially dangerous or violent prisoners; however, the belt more recently is being used on defendants in courtrooms during trials. *Id.* There are approximately 1,000 of these belts in circulation in the United States. Amnesty International, *Stopping the Torture Trade* 29 (2001).

Two nine-volt batteries connected to prongs that are attached to the wearer over the left kidney region power the belt. Julie Brienza, *Stun Belts Zapped by Civil Liberties Groups,* 35 Trial 99, 100 (Apr. 1999); Dahlberg, *supra,* at 247. The belt may be activated from as far away as 300 feet, and once activated it delivers an eight-second, 50,000–volt shock that cannot be stopped. Amnesty International, *supra,* at 28; Brienza, *supra,* at 100; Dahlberg, *supra,* at 247. This high-pulsed electrical current travels through the body along blood channels and nerve pathways.

Dahlberg, *supra*, at 247–48. The belt's electrical emission knocks down most of its victims, causing them to shake uncontrollably and remain incapacitated for up to forty-five minutes. Dahlberg, *supra*, at 248; *Colorado v. Melanson*, 937 P.2d 826, 835 (Colo.Ct.App.1996). Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. Dahlberg, *supra*, at 249. Activation may cause some wearers to suffer heartbeat irregularities or seizures. Dahlberg, *supra*, at 250–52. Manufacturers of the stun belt emphasize that the belt relies on the continuous fear of what might happen if the belt is activated for its effectiveness. Amnesty International, *supra*, at 29.

In *Hawkins v. Comparet–Cassani*, 33 F.Supp.2d 1244 (C.D.Cal.1999), a defendant who had a stun belt placed on him prior to a sentencing hearing and later activated at the judge's order filed a civil rights action against the county, judge, sheriff, and others. The defendant sought, among other things, a preliminary injunction against the Los Angeles County Sheriff's Department preventing the placement and activation of stun belts on defendants pending the outcome of trial. In response to this request, the trial judge in the United States District Court for the Central District of California observed:

> The stun belt, even if not activated, has the potential of compromising the defense. It has a chilling effect. It is inherently difficult to define in a particular judicial proceeding the boundary between permissible and impermissible conduct—the boundary between aggressive advocacy and a breach of order. An individual wearing a stun belt may not engage in permissible conduct because of the fear of being subjected to the pain of a 50,000 volt jolt of electricity. For example, a defendant may be reluctant to object or question the logic of a ruling—matters that a defendant has every right to do. A defendant's ability to participate in his own defense is one of the cornerstones of our judicial system. A pain infliction device that has the potential to compromise an individual's ability to participate in his or her own defense does not belong in a court of law.
>
> Further, if the defendant is shocked by the stun belt, the defense is likely to be even more compromised. First, it is unreasonable to expect a defendant to meaningfully participate in the proceeding following a shock. Second, having been shocked for a particular conduct the defendant may presume that other conduct, even if appropriate, may result in other shocks.

*Id.* at 1262. Finding a likelihood of success on the merits at trial, the trial judge granted a preliminary injunction prohibiting the Los Angeles County Sheriff's Department "to either place or activate a stun belt on a prisoner in his custody pending the outcome of trial." *Id.*

Although not all courts have taken this stance,[4] we agree with the observations of the federal court judge and thus hold that henceforth stun belts may not be used on defendants in the courtrooms of this State.

4. *See, e.g., Young v. Georgia*, 269 Ga. 478, 499 S.E.2d 60, 61 (1998) (holding that use of an electronic security measure is permissible where it is shielded from view and defendant is not harmed by its use). *Hollaway v. Nevada*, 6 P.3d 987, 994 (Nev.2000) (noting that although stun belts are okay in some instances, reversal of the death sentence in this case was necessary because the accidental activation of the stun belt "reinforce[d] the image of [the defendant] as an extremely violent man with whom authorities had to take exceptional security precautions.").

This is so because we believe that the other forms of restraint listed above can do the job without inflicting the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated. This, however, does not mean Wrinkles is entitled to relief.

 Before trial began, the trial court informed counsel that Wrinkles would have to wear either shackles or a stun belt during trial. P–C R. at 1139, 1326. Without objection counsel chose a stun belt, and Wrinkles claims they rendered ineffective assistance as a result. We disagree. Although with this opinion we declare that stun belts no longer have a place in Indiana courtrooms, that was not the case at the time of Wrinkles' trial.[5] Our prohibition is motivated primarily by the potential effect a stun belt may have upon the person wearing the device. However, without the benefit of this declaration, counsel were concerned about the effect on the jurors if they were to observe their client wearing a particular device. Counsel believed that the chance of the jury seeing the shackles was fairly high. P–C R. at 1139. On the other hand, counsel opted for the stun belt because they thought the jurors would not be able to see it. P–C R. at 1139. Obviously, they were later proven wrong. However, at the time the decision was made, it was a prudent one. "Tactical choices by trial counsel do not establish ineffective assistance of counsel even though such choices may be subject to criticism or the choice ultimately prove[s] detrimental to the defendant."

*Garrett v. State*, 602 N.E.2d 139, 142 (Ind. 1992). Rather, "[c]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." *Conner*, 711 N.E.2d at 1248. Wrinkles has not demonstrated that counsels' strategic decision in choosing a stun belt as opposed to shackles rises to the level of ineffective assistance of counsel.

 As for counsels' failure to object to the trial court's order, it is error for a trial court to require a defendant appearing before the court to wear restraints as a matter of course. Rather, the restraints must be necessary, and the reasons supporting the trial court's determination must be placed on the record. *Coates*, 487 N.E.2d at 169. Nonetheless, the record reflects that the trial court apparently has a policy of requiring defendants to wear restraints regardless of whether they have previously exhibited any conduct justifying restraints. P–C R. 1139–40. Attorney Danks testified at the post-conviction hearing that neither he nor attorney Vowels objected to the trial court's order because the trial judge would have ordered Wrinkles to wear shackles instead. P–C R. at 1139–40. Thus, even though the trial court's policy would not likely withstand appellate scrutiny if the issue were presented, it is apparent that at least at the time of Wrinkles' trial, an objection to wearing restraints would not have been sustained by the trial judge even if made. Accordingly, Wrinkles has not sustained his burden of demonstrating that counsels'

---

**5.** For example, in *Flowers v. State*, 738 N.E.2d 1051 (Ind.2000), *reh'g denied*, the defendant threatened the trial judge. After conducting a hearing, the judge ordered the defendant to wear a stun belt for the remainder of the trial. The defendant subsequently filed motions for change of judge and mistrial on grounds that the trial court was biased and prejudiced as evidenced by the stun belt. On direct appeal, we found that the trial court was not biased or prejudiced in ordering the defendant to wear the stun belt because of the concern for courtroom safety. *Id.* at 1061. The defendant did not challenge, and we did not address, the issues raised in the instant appeal.

performance on this issue fell below an objective standard of reasonableness.

### (2) *Victim Impact Statement*

■■■■■ The Pre-sentence Investigation Report contained a statement from Mae McIntire recommending that Wrinkles receive the death penalty.[6] McIntire had been responsible for raising Wrinkles' wife Debbie and her brother Mark. Wrinkles contends counsel should have objected to this statement because it violated *Bivins*, which provides that victim impact evidence can only be admitted in death penalty cases if it is relevant to an aggravating or mitigating circumstance. *See Bivins*, 642 N.E.2d at 957. Assuming counsel should have objected to this statement on the ground that it is not relevant to the multiple murder aggravator, which is the charged aggravator in this case, Wrinkles has not shown that the trial court even relied on this statement in imposing the death penalty. In fact, the trial court did not mention this statement in either its sentencing statement or its sentencing order. R. at 399–403, 3372–80. Further, the evidence supporting the multiple murder aggravator is strong in that Wrinkles confessed to shooting all three victims. *See Bivins*, 642 N.E.2d at 957 (holding that

admission of improper victim impact evidence was harmless beyond a reasonable doubt in part because of "the strong evidence of the charged aggravating circumstance...."). The post-conviction court did not err in concluding that counsel were not ineffective for failing to object to Mae McIntire's statement.

### (3) *Wrinkles' Prior Bad Acts*

The State introduced evidence through two witnesses of Wrinkles' aggressive behavior toward his wife.[7] Counsel lodged no objections to this testimony. Wrinkles contends that "[o]bjections to any of this testimony would have been sustained because it was inadmissible" and that he was prejudiced because "[the testimony] made him appear violent and dangerous." Br. of Appellant at 31. The State counters that this testimony was admissible to show Wrinkles' motive and that he was not prejudiced in light of the facts of the shootings—Wrinkles donned himself in camouflage, cut the phone lines, and shot his wife, brother-in-law, and sister-in-law in the presence of children.

■■■■■ Although evidence of other crimes, wrongs, or acts is not admissible to show action in conformity therewith, such

---

**6.** The victim impact statement states in part:

> Mrs. McIntire feels that the defendant should receive the death penalty. She reports that Lindsay, the defendant's [daughter,] [h]as said she does not feel her father should be put to death but she did not ever want to see him again. The defendant's son has made no comments con[c]erning this sentence. Mrs. McIntire stated that he has shown no remorse and that neither should the Court.

> R. at 256.

**7.** Wrinkles points to the following testimony. Steve Culley, Debbie's divorce attorney, testified that Wrinkles made "harassing" phone calls to the Fulkerson home while Debbie was staying there and that Wrinkles "was con-

cerned that the Prosecutor may be pressing charges and putting him in jail [for those calls because of the protective order that was in place at the time]...." R. at 2248.

David Plemmons, Wrinkles' friend, testified that in May 1994, two months before the shootings, Wrinkles and Debbie got into an argument; Wrinkles retrieved a gun, cocked it, and pointed it at Debbie; Debbie grabbed the gun in defense, and it discharged; a neighbor called police; and when police arrived he and Debbie covered for Wrinkles. R. at 3097–98. When asked on cross-examination if he recalled this incident, Wrinkles responded, "Not really." R. at 2737. When asked if he denied that the incident happened, Wrinkles responded, "I don't remember it." R. at 2738.

evidence may be admissible for other purposes, such as motive. Evid.R. 404(b); *see also Cook v. State,* 734 N.E.2d 563, 567 (Ind.2000) ("[E]vidence of motive is always relevant in the proof of a crime."), *reh'g denied; Charlton v. State,* 702 N.E.2d 1045, 1050 (Ind.1998) (finding evidence of a protective order relevant to show the hostile relationship that existed between the defendant and the victim in order to prove motive for the murder and not unduly prejudicial because of the other "damaging" evidence against the defendant). Accordingly, Wrinkles has failed to prove that an objection to such testimony would have been sustained if made. Further, in light of the fact that Wrinkles admitted shooting Debbie, Mark, and Natalie, he has failed to show prejudice. The post-conviction court did not err in concluding that counsel were not ineffective for failing to object to this testimony.

(4) *Prosecutor's Comments during Closing Argument*

■■■ During summation the prosecutor referred to Wrinkles as a "psychopath" and "sociopathic."[8] Wrinkles contends counsel should have objected because "[t]here was no evidence to support the prosecutor's labels" and "[t]hese comments could only be meant to inflame the passions or prejudices of the jury." Br. of Appellant at 32 (quotation omitted).

■■■ Wrinkles has not shown that an objection to the prosecutor's comments would have been sustained if made. There was testimony introduced at trial that Wrinkles had been diagnosed as suffering from at least five mental illnesses. R. at

2994–96. Under those circumstances the comments of the prosecutor were fair characterizations of the evidence. *See Miller v. State,* 623 N.E.2d 403, 408 (Ind. 1993) (finding no error where the prosecutor called the defendant a disparaging name because he was merely commenting on the evidence). Further, counsel may have had a strategic reason for not objecting, such as that an objection would have called even more attention to the prosecutor's remarks. *See Charlton,* 702 N.E.2d at 1051–52 (holding that counsel was not ineffective for failing to object to the prosecutor's closing argument because counsel could have made a strategic decision not to object). The post-conviction court did not err in concluding that counsel were not ineffective for failing to object to the prosecutor's remarks in closing argument.

(5) *Debbie White's Testimony*

■■■ Although she was not listed as a State's witness, Debbie White, a bookkeeper at Goldman's Pawn Shop, testified without objection that Mark pawned two shotguns in May 1994. R. at 2498–99. This was the substance of her entire testimony. Counsel then briefly cross-examined her. R. at 2501–02. Wrinkles contends that counsel were ineffective for failing to object because "[h]er testimony undermined the defense theory that the Fulkerson's house was heavily armed." Br. of Appellant at 33. Although had counsel objected, the trial court should have granted either a continuance or an adjournment to allow counsel to depose the witness, *see Craig v. State,* 737 N.E.2d 442, 444 (Ind.Ct.App. 2000), Wrinkles has failed to establish

---

8. The prosecutor stated:
 So, the only way [Wrinkles] can avail himself of [Voluntary] Manslaughter is if he is an ordinary man—a reasonable man, an average man; although you can decide what ordinary means. In other words, psy-chopaths, like Eric Wrinkles, don't get the benefit of [Voluntary] Manslaughter. Just because they're sociopathic doesn't mean they can have these feelings that it's okay to kill someone and therefore it's sudden heat. R. at 3172.

prejudice because he has not shown that counsel would have questioned her differently had she been deposed or a continuance granted. The post-conviction court did not err in concluding that counsel were not ineffective for failing to object to Debbie White's testimony.

(6) *Mishandling of the Murder Weapon*

██ When Officer James VanCleave recovered the murder weapon, a .357 magnum revolver, it appeared to be functioning. However, Sergeant Edward Wessel testified at trial that the weapon was inoperable when he received it for testing and that it took him thirty to forty-five minutes to repair it. R. at 2431, 2477. Wrinkles alleges that the State "mishandled" the weapon while in its possession and that counsel were ineffective for failing to object to its admission because "it was not in substantially the same condition as at the time of the crime." Br. of Appellant at 33 (quotation omitted).

Wrinkles has failed to prove that an objection would have been sustained if made because the weapon was operable when admitted into evidence and Sergeant Wessel, after repairing the weapon, was able to determine that eleven bullets recovered from the crime scene and the victims' bodies were fired by the weapon. R. at 2433–34. Further, Wrinkles has not shown prejudice in that he admitted firing the weapon. R. at 2753. The post-conviction court did not err in concluding that counsel were not ineffective for failing to object to the admission of the murder weapon.

D. *Failure to Tender Jury Instruction on Life Without Parole*

██ Wrinkles argued before the post-conviction court that counsel were ineffective for failing to tender a jury instruction on life without parole. Indiana Code section 35–50–2–9(d) requires a trial court in a capital case to instruct the jury on the statutory penalties for murder: death, life without parole, or a term of years. Although the trial court failed to give such an instruction, we held on direct appeal that the error was not reversible. *Wrinkles,* 690 N.E.2d at 1171. Having reached that conclusion, we also conclude that for the same reasons, counsel did not render ineffective assistance. *See Douglas v. State,* 634 N.E.2d 811, 821 (Ind.Ct.App. 1994) (holding that if there is no reversible error, then the prejudice prong of ineffective assistance of counsel is not met), *trans. denied; see also Holleman v. State,* 641 N.E.2d 638, 641 (Ind.Ct.App.1994) (holding that absent a showing of any reversible error at trial, the defendant could not establish on post-conviction that counsel was ineffective), *trans. denied.*

E. *Inadequate Penalty Phase Investigation and Presentation*

██ Before the post-conviction court, Wrinkles claimed ineffective assistance based on counsels' alleged inadequate investigation for the penalty phase of trial and insufficient presentation of evidence in mitigation of the death sentence. More specifically, Wrinkles argues that counsel "failed to investigate and present the impact of [his] drug addiction on his mental health, as well as other aspects of his background and personality." Br. of Appellant at 47. He claims that if such evidence had been presented during the penalty phase, the jury would have sentenced him to a term of years rather than death.

The record shows that before the penalty phase of trial began on May 20, 1995, the trial court incorporated the evidence from the guilt phase of trial. R. at 3193. Counsel specifically requested that Dr. Engum's guilt phase testimony and report be incorporated. R. at 3230. On May 19,

1995, just one day before the penalty phase, Dr. Engum testified in depth about Wrinkles' various mental illnesses, one of which was "amphetamine dependence, with the likelihood of amphetamine-induced psychotic disorder with delusions, which is basically saying he bec[a]me increasingly paranoid when he would abuse the methamphetamine." R. at 2994–95. Dr. Engum then explained the effects of Wrinkles' amphetamine dependence on his behavior. R. at 2995.

■ Despite this incorporated testimony, Wrinkles argues that counsel should have called an expert during the penalty phase who could "have explained to the jury how dangerously addictive methamphetamine is and how addicts become violent and paranoid." Br. of Appellant at 55. However, Dr. Engum testified during the guilt phase to just that—"a pretty typical trait of severe methamphetamine abuse [is that the individual] become[s] increasingly aggressive, angry, hostile; in some cases, violent aggressive, but highly paranoid." R. at 2995. When mitigating evidence has already been presented at the guilt phase of trial, counsel's failure to duplicate this evidence during the penalty phase of trial does not constitute deficient performance. *Wisehart v. State,* 693 N.E.2d 23, 48 (Ind. 1998); *see also* I.C. § 35–50–2–9(d) (providing that the jury "may consider all the evidence introduced at the trial stage of the proceedings [during the penalty phase]."); *Benefiel v. State,* 716 N.E.2d 906, 913 (Ind.1999) ("While hearing the same testimony again at the penalty phase might have reinforced the idea that the mental disease discussed during the guilt phase could have mitigating weight, we cannot say that the failure to reintroduce the testimony created a reasonable probability that the jury would have recommended against death."), *cert. denied,* 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000).

Wrinkles' real argument seems to be that counsel should have called an additional expert, such as Dr. Evans or Dr. Smith, during the penalty phase to further explore his methamphetamine addiction. Attorney Vowels testified at the post-conviction hearing that he did not want to dwell on Wrinkles' methamphetamine addiction during the penalty phase because he did not want Wrinkles to appear as a "heavy doper." P–C R. at 1327. This was a strategy decision that we will not second-guess. *See Lambert,* 743 N.E.2d at 743 (holding that it was reasonable for counsel to emphasize the defendant's character during the penalty phase instead of relying on complicated mental health issues); *Timberlake,* 690 N.E.2d at 261 ("As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase. After an investigation into potentially mitigating evidence, a defense counsel may decide that it would be better for his client not to argue, as mitigation evidence, defendant's background history such as a history of drug abuse and a bad family life.") (citations omitted); *Hayes v. Lockhart,* 852 F.2d 339, 352 (8th Cir.1988) (observing that counsel's decision not to present *additional* mitigating evidence regarding defendant's drinking problem was a "reasonable trial tactic, one that was based upon counsel's calculated assessment that the risk of probable harm exceeded the possible benefit that might have resulted...."), *judgment vacated on other grounds,* 491 U.S. 902, 109 S.Ct. 3181, 105 L.Ed.2d 691 (1989).

Wrinkles' next contention concerns evidence of his background and personality. During the penalty phase of trial, counsel called Steven Brock, a sentencing consultant and mitigation specialist who, before

testifying, interviewed approximately forty people including Wrinkles and his family, friends, and customers. R. at 3231, 3237. He also reviewed Wrinkles' medical and educational records, depositions conducted in the case, and Dr. Engum's report. R. at 3240. Brock testified in great detail about Wrinkles' early years, particularly that he grew up in a troubled home with an alcoholic father who physically and verbally abused his wife and children. R. at 3243–47. Brock also identified other mitigators: Wrinkles' lack of significant criminal history, R. at 3249; he was under extreme mental and emotional disturbance when he committed the murders, R. at 3249; his capacity to appreciate the criminality of his conduct and to conform his conduct to the law was substantially impaired as a result of mental disease or defect, R. at 3249–50; he has a psychological profile as put forth by Dr. Engum as a paranoid individual who sees conspiracies everywhere, R. at 3251; and his daughter Lindsay Wrinkles and the guardians of the Wrinkles and Fulkerson children did not want him executed, R. at 3259.[9]

■ In this appeal, Wrinkles challenges Brock's testimony on two grounds. First, he argues that allowing Brock to testify instead of his family, friends, and customers gave the impression "that Wrinkles had no one who cared about him and had to pay someone to testify on his behalf." Br. of Appellant at 48. However, this was a tactical decision that we will not second-guess. *See Wisehart,* 693 N.E.2d

at 48 n. 26 ("[W]hich witnesses to call is the epitome of a strategic decision.") (quotation omitted).

■ Next, Wrinkles argues that Brock left out important information in his summary. For example, Wrinkles points to the following post-conviction witnesses: his mother and brother gave examples of the abuse he received as a child from his alcoholic father; his friends testified that he abused drugs and had not been acting like himself weeks before the murders; and his customers testified that he was a good mechanic who went out of his way for them. However, Wrinkles' family testified to the same events at the post-conviction hearing that Brock testified to during the penalty phase of trial. *Compare* P–C R. at 378–88, 389–98 *with* R. at 3244–46. Therefore, their testimony would have been cumulative to Brock's testimony. Further, Wrinkles' drug use was presented during the guilt phase through four lay witnesses, one expert witness, and Wrinkles himself. R. at 2711–12, 2715, 2720, 2722–23, 2834, 2843, 2861–62, 2931–32, 2935–37, 2994–97, 3002, 3006–07. *See Wisehart,* 693 N.E.2d at 48 ("[W]hen mitigating evidence has already been presented, the failure of counsel to duplicate during the penalty phase the mitigating evidence presented to the jury during the guilt phase does not constitute deficient performance."). Finally, as far as Wrinkles' customers are concerned, counsel could have made a decision not to call them because they possibly

---

**9.** In addition to Brock, counsel called Mary Winnecke, Carolyn Casper, and Lindsay Wrinkles at the penalty phase. Mary Winnecke, Natalie Fulkerson's mother and the legal guardian of the Fulkerson children, testified during the penalty phase of trial that Wrinkles had been under the influence of drugs for the last five years and that he thought there was a conspiracy to get him. R. at 3205, 3206. Winnecke testified further that she did not think Wrinkles should be

sentenced to death because she is religiously opposed to such punishment. R. at 3208–09. Carolyn Casper, the legal guardian of the Wrinkles children, testified during the penalty phase of trial that she did not want Wrinkles to receive the death penalty because of the adverse effect it would have on the children. R. at 3218–19. Lindsay, Wrinkles' daughter, also testified during the penalty phase of trial that she did not want her father to receive the death penalty. R. at 3229.

would have been exposed to Wrinkles' bad acts on cross-examination. This was a strategy call that we will not second-guess. *See Brown v. State*, 691 N.E.2d 438, 447 (Ind.1998) (identifying that "[a] decision regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess...."). The post-conviction court did not err in concluding that counsel were not ineffective on these grounds.

*F. Failure to Present Mitigating Evidence During The Sentencing Phase*

 Wrinkles argues the post-conviction court erred when it refused to conclude that counsel were ineffective based on their alleged failure to present evidence during the sentencing phase of trial supporting a sentence other than death. Contrary to Wrinkles' claim, the record shows that counsel prepared a thorough and detailed forty-page sentencing memorandum and attorney Danks made an oral argument to the trial court on why the court should not impose the death penalty. R. at 267–307, 3362, 3368–70.

The record also shows that during the penalty phase of trial counsel presented evidence concerning Wrinkles' drug use, personality, and social history. To the extent Wrinkles argues that counsel should have presented the evidence anew during the sentencing phase of trial, he is mistaken. Where counsel has already presented mitigating evidence during the guilt phase of trial and discussed it during the penalty phase, presenting the evidence again during the judge sentencing phase of trial is cumulative. *Wisehart*, 693 N.E.2d at 49. We find no error on this issue.

*G. Indiana Criminal Rule 24 Violation*

 For his last allegation concerning ineffective assistance of trial counsel,

Wrinkles argued before the post-conviction court that counsel acted deficiently because throughout his representation each lawyer carried a felony caseload far in excess of that permitted under Indiana Criminal Rule 24(B)(3). The Rule provides in pertinent part: "[a]ppointed counsel shall not accept workloads which, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations." *Id.* Salaried or contractual public defenders can only be appointed as trial counsel in capital cases if:

(i) the public defender's caseload will not exceed twenty (20) open felony cases while the capital case is pending in the trial court;

(ii) no new cases will be assigned to the public defender within thirty (30) days of the trial setting in the capital case;

(iii) none of the public defender's cases will be set for trial within fifteen (15) days of the trial setting in the capital case; and

(iv) compensation is provided as specified in paragraph (C).

Ind.Crim. Rule 24(B)(3)(c).

Although attorney Danks was in compliance with subsection (B)(3)(c)(i) of Rule 24 when he was appointed lead counsel on July 21, 1994, he was out of compliance a month later. When attorney Vowels was appointed co-counsel on July 28, 1994, his inventory of public defender cases totaled forty-two open felony cases, more than twice the maximum permitted. At one point attorney Danks' felony caseload reached thirty-three while attorney Vowels' felony caseload reached fifty-six. In February 1995, just three months before Wrinkles' trial began, attorney Vowels finally asked the trial court to remove him from some cases so he could devote more

time to Wrinkles' case. P–C R. at 575. The trial court subsequently removed attorney Danks from four cases and attorney Vowels from seven cases. P–C R. at 575. However, because lawyers Danks and Vowels did not inform the trial court exactly how many felony cases were in their inventory or how far they were over the twenty-case limit, *see* P–C R. at 1186, 1231, these removals still did not put them in compliance with subsection (B)(3)(c)(i). Also, in addition to their public defender felony caseloads, both attorneys maintained substantial private practices, and the record is silent on the number of additional private felony cases that counsel carried during their representation of Wrinkles.

Further, the caseloads of lawyers Danks and Vowels violated subsection (B)(3)(c)(ii) of Rule 24, which prohibits the assignment of new cases to the public defender within thirty days of a capital trial. Attorney Danks was assigned two public defender cases within thirty days of Wrinkles' trial, and attorney Vowels was assigned five public defender cases within thirty days of Wrinkles' trial. Attorney Vowels' caseload also violated subsection (B)(3)(c)(iii) of Rule 24, which specifies that none of the public defender's cases may be set for trial within fifteen days of the capital trial. Attorney Vowels represented Bruce Anthony at trial on a felony battery charge on May 3, 1995, just eight days before voir dire in Wrinkles' case.

Wrinkles contends the foregoing Criminal Rule 24 violations created an actual conflict of interest, violated his equal protection and due process rights, and represented ineffective assistance of counsel per se. According to Wrinkles, a new trial is warranted. We recently addressed the remedy for a violation of Criminal Rule 24 in *Prowell*. In that case, the trial court appointed lawyers Danks and Vowels, the same attorneys as here, to represent Vincent Prowell in a capital case. Attorney Vowels carried a felony caseload in violation of Criminal Rule 24 throughout his representation of Prowell. We determined that the remedy for a Criminal Rule 24 violation is the withholding of fees and expenses. More specifically, we observed that the State may refuse to compensate a county for attorneys' fees and expenses where a defense attorney is found to be in violation of the caseload limits prescribed by the rule without the court's permission. *Prowell*, 741 N.E.2d at 716. "Presumably, the county would then penalize the lawyer who violated the rule by withholding payment for time spent on cases where the rule was violated. Experience suggests that lawyers are likely to observe rules if their paychecks depend on it." *Id.* We also noted that trial courts are not expected "to police sua sponte the caseloads of the counsel appearing before them. It is incumbent upon defense counsel to raise any issue presented by counsel's workload in excess of the limits laid out in the rule." *Id.*

Pointing out that both lawyers in this case violated Criminal Rule 24, Wrinkles suggests that the "paycheck" remedy is not sufficient in this case and insists that he is entitled to a new trial. According to Wrinkles, counsel rendered ineffective assistance precisely because they were in non-compliance with Criminal Rule 24. We disagree. The record shows otherwise. Attorney Danks testified at the post-conviction hearing that his caseload did not allow him adequate time to prepare for Wrinkles' trial. P–C R. at 920. However, he also testified that he never had enough time to prepare for any trial, not just this one. P–C R. at 1147, 1175. Attorney Danks testified further that this lack of time did not interfere with any legal research or interviewing of witnesses. P–C R. at 921. Attorney Vowels testified

at the post-conviction hearing that he had enough time to prepare for Wrinkles' trial. P–C R. at 1325.

The record shows that in preparation for trial both lawyers engaged in the following activities: met regularly to discuss the direction and progress of the case, P–C R. at 1207, 1208, 1317; met with Wrinkles several times before trial, P–C R. at 1162–68, 1296–1310; interviewed witnesses, P–C R. at 568, 1171–72, 1316; consulted numerous times with trial investigator Mark Mabrey, sentencing consultant and mitigation specialist Steven Brock, and neuropsychologist Dr. Eric Engum, P–C R. at 567, 1318, 1321, 2396–97; consulted other experts including Paula Sites, P–C R. at 1297, 1304, 1305, 1307; sought discovery and filed multiple pretrial motions, R. at 29–30, 34–37, 39–40, 42–43; P–C R. at 567, 1313; prepared and filed briefs in support of various motions, R. at 47–94; prepared witnesses for trial, P–C R. at 1043, 1044, 1203, 1204; deposed approximately thirty potential witnesses, P–C R. 1165–66, 1200, 1305–06, 1308; visited the crime scene, P–C R. at 1199, 1322; viewed videotapes and pictures of the crime scene, P–C R. at 1322; and read the police and autopsy reports, P–C R. at 1200–01, 1322.

Attorney Danks' billing records reflect that he spent 319 hours on Wrinkles' case, and attorney Vowels' billing records show that he spent 401 hours on Wrinkles' case. P–C R. at 1177, 1302, 1310. Both attorneys testified at the post-conviction hearing that they spent more time on Wrinkles' case than they actually billed for. Norman Lefstein, Dean and Professor of Law at Indiana University School of Law–Indianapolis, testified as an expert on ineffective assistance of counsel and noted that the average time spent on a capital case that goes to jury trial through completion is 1,000 hours for two attorneys. P–C R. at 1702. He testified that that number varies depending on the complexity of the case. P–C R. at 1702. Here, lawyers Danks and Vowels spent more than 720 hours on a capital case in which the defendant confessed. We cannot conclude that the post-conviction court erred in its determination that counsel were not ineffective based solely on their non-compliance with Criminal Rule 24.

## II. Ineffective Assistance of Appellate Counsel

The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel; that is, the defendant must show that appellate counsel was deficient in his performance and that this deficiency resulted in prejudice. *Ben–Yisrayl,* 729 N.E.2d at 106. This Court has recognized three types of ineffective assistance of appellate counsel claims, namely: (1) counsel denied the defendant access to appeal; (2) counsel waived issues; and (3) counsel failed to present issues well. *Bieghler v. State,* 690 N.E.2d 188, 193–95 (Ind.1997). As Wrinkles concedes, the second category is the only category applicable here. This category will lead to a finding of deficient performance only when the reviewing court determines that the omitted issues were significant, obvious, and "clearly stronger than those presented." *Id.* at 194 (quotation omitted). This is because "the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Id.* at 193 (quotation omitted).

Wrinkles contends that the post-conviction court erred in its conclusion that his appellate counsel were not ineffective for not raising the following issues on direct appeal: (1) the trial court committed fundamental error in admitting evidence of Wrinkles' prior bad acts; (2) the trial court committed fundamental error when it considered a victim impact statement which

was contained in the Pre-sentence Investigation Report; and (3) the trial court committed fundamental error by not giving an instruction on life without parole. We addressed issues (1) and (2) in the context of ineffective assistance of trial counsel and concluded that trial counsel were not ineffective for failing to object to evidence of Wrinkles' aggressive behavior toward Debbie and the victim impact statement. Therefore, the post-conviction court did not err in concluding that appellate counsel were not ineffective for failing to raise these issues on direct appeal. *See Woods v. State*, 701 N.E.2d 1208, 1221 (Ind.1998) ("[I]neffective assistance of appellate counsel requires the petitioner to overcome the double presumption of attorney competence at both trial and appellate levels."). As for (3), counsel raised, and we addressed, this issue on direct appeal. *See Wrinkles*, 690 N.E.2d at 1171. Again, the post-conviction court did not err in concluding that Wrinkles did not receive ineffective assistance of appellate counsel.

## Conclusion

Wrinkles has failed to prove that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. Accordingly, we affirm the post-conviction court's denial of Wrinkles' petition for post-conviction relief.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

BOEHM, J., concurs in all parts except Part I.C.1 in which he concurs in result with separate opinion.

BOEHM, Justice, concurring and concurring in result.

I concur in all parts of the majority opinion except Part I.C.1, in which the majority categorically prohibits use of the "stun belt" in Indiana courtrooms. I generally agree with the points the majority makes about the use of the belt, and I certainly agree that trial court findings are required before any form of courtroom restraint is to be used. However, trial courts are often faced with hard choices. It is not at all clear to me that the belt is a less desirable alternative to restraints that are plainly visible and convey to the jury the message that the defendant cannot be trusted to comport himself in a manner consistent with courtroom decorum. Indeed, I would think some defendants might, as did Wrinkles in this case, prefer the belt to a gag or more visible restraints. The majority is surely correct that any of these alternatives is to be used only where necessary and where supported by appropriate findings. But where some form of restraint is to be used, I would not categorically prohibit the belt in favor of others that may be even more hostile to a fair trial.

I concur in the majority's view that Wrinkles has not shown ineffective assistance of counsel for failure to object to the use of the belt. Trial counsel here were faced with a very difficult guilt phase, to say the least. Conviction seems to me to have been virtually a foregone conclusion, with the penalty being the only realistic battleground for defense counsel. To decide not to take issue with the trial judge on this issue would seem to me to be well within the sort of judgment that lawyers are forced to make. Accordingly, I concur in the result reached by the majority.