**Kenneth Dwayne VAUGHN,
Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 45A05–1102–CR–57.

Court of Appeals of Indiana.

Sept. 14, 2011.

Transfer Granted Dec. 2, 2011.

Kristin A. Mulholland, Office of the Public Defender, Crown Point, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Kenneth Dwayne Vaughn was on trial for a bank robbery and took the stand in his own defense. When his public defender asked him the first question, Vaughn began criticizing his attorney and was therefore non-responsive to the question. The trial judge told Vaughn to stop, but Vaughn did not listen. Vaughn was restrained and had a hand placed over his mouth in the presence of the jury. The jury was removed from the courtroom and later brought back in. When Vaughn finished his testimony, his attorney moved for a mistrial, which the trial court denied. Vaughn now appeals the denial of his mo-

tion for mistrial. Concluding that Vaughn was placed in a position of grave peril to which he should not have been subjected, we reverse and remand for a new trial.

### Facts and Procedural History

On the morning of September 5, 2008, a black male with a beard walked into a Fifth Third Bank in Merrillville, Indiana, wearing a checkered shirt, baseball hat, and dark sunglasses on a gloomy day. The man approached teller Tyaisha Gardner, who was immediately suspicious because of his sunglasses, and told her he wanted to open an account. He then dropped a plastic bag on the counter and instructed her, in a "threatening way," to "fill it up." Tr. p. 77. Because the man had his hand to his side, Gardner believed he had a gun and was scared. Gardner put the cash from her drawer, which amounted to approximately $3500, plus a stack of consecutively-marked bait money into the bag. When the man walked away, Gardner pressed the security button under her counter.

Another teller, Jennifer Wilcox, heard the man mumble something to Gardner and then heard Gardner fill up the bag. Like Gardner, Wilcox did not maintain eye contact with the man. They both learned in training not to maintain eye contact with robbers because it draws extra attention to them and it is best to get robbers in and out as quickly as possible. Wilcox also hit her security button when the man left. Bank manager Janet Alsop observed the man exit the bank, enter an older model gold/tan Chevrolet Blazer with passenger-side damage, and drive away. Alsop called police, who arrived minutes later.

Merrillville Police Department Officer Daniel Veschak was on the look-out for the Blazer when he spotted a vehicle that matched the description and began following it. When Officer Veschak activated his emergency lights and siren, the Blazer made no attempt to stop but continued. A pursuit ensued on residential streets with speeds reaching up to eighty miles per hour. The Blazer drove aggressively and disregarded traffic signals. Eventually, the Blazer slowed down to approximately five to ten miles per hour, at which point the driver jumped out. The Blazer crashed into a building, and a foot chase ensued. The driver, identified as Vaughn, was quickly apprehended. A large amount of money was found on Vaughn, including some of the bait money. When police searched the Blazer, money and a plastic bag were found inside. The checkered shirt, hat, and sunglasses were never recovered. Both Gardner and Wilcox later identified Vaughn as the bank robber.

The State charged Vaughn with Class C felony robbery, Class D felony resisting law enforcement, Class A misdemeanor resisting law enforcement, and Class D felony theft. Noah Holcomb, Jr. was appointed as Vaughn's public defender. Vaughn filed several pretrial motions to represent himself.

A three-day trial was held in November 2008. At the beginning of Vaughn's jury trial, the trial court held a hearing on Vaughn's latest motion to proceed pro se. Vaughn ultimately withdrew this motion. On the second day of trial, Vaughn again asked to proceed pro se, but the trial court denied this motion. On the final day of trial, Vaughn, the only defense witness, testified on his own behalf. After Vaughn stated his name for the record, Attorney Holcomb asked Vaughn the following open-ended question, "do you have anything to say to the jury with regards to what led to these charges being filed against you?" Tr. p. 336. The following then occurred:

> [THE WITNESS:] What I want to say is that ah—I ask you to argue something and you didn't argue it.

THE COURT: Hold on a second.

THE WITNESS: I asked him—

THE COURT: Stop.

THE WITNESS: To tell you about—

THE COURT: Stop.

THE WITNESS: I tell you about this photograph.

THE COURT: I told you to stop. Ladies and gentlemen, retire to the jury room. Remove him from the courtroom.

WHEREUPON THE JURY RETIRED TO THE JURY ROOM.[1]

THE WITNESS: He don't want to tell you.

THE COURT: Remove him from the courtroom. Cover his mouth.

THE WITNESS: I asked him to get that money.

BY THE BAILIFF: Quiet.

THE WITNESS: I asked him—

BY THE BAILIFF: Now are you going to be quiet? I let my hands go.

*Id.* at 336–38. Outside the presence of the jury, the trial court had the following discussion with Vaughn:

THE COURT:

Now, how do you want to proceed? We are going to get through this trial one way or the other. And even contrary to what just happened and even contrary to my personal feeling that you have been trying to torpedo this case and cause a mistrial since the beginning, I have no problem with giving you a fair trial.

In fact, I recall earlier in the case you told me I was doing my job. Now, had you made the decision to unequivocally represent yourself instead of flimflamming back and forth, Mr. Holcomb wouldn't even be sitting in this courtroom today. But it is the fact that you keep changing your mind. And you won't stick to your answer every time I ask you. That is the reason why you have a lawyer sitting next to you.

Now the way Mr. Holcomb just started his question is he is asking you open ended questions which means you can say whatever happened on that day. You can give your version of the events. And the State, I am not going to allow them to cut you off when you go on a big, long narrative answer as to what happened on that day.

\*  \*  \*  \*  \*  \*

THE COURT:

So are you going to start with the testimony I told my attorney to do this; I told my attorney to do that; he didn't do it? Or do you want to tell your side of the story?

BY THE DEFENDANT:

I want to tell my side of the story.

\*  \*  \*  \*  \*  \*

THE COURT:

All right. Let's uncuff him.

BY THE DEFENDANT:

You don't have to worry about me being violent.

\*  \*  \*  \*  \*  \*

THE COURT:

All right. Well, I think the fact that you got handcuffed and he had to put his hand over your mouth after I told you repeatedly to be quiet and you kept talking might have something to do with why you just got cuffed.

*Id.* at 342–45. At this point, the jury was brought back into the courtroom, and the trial court stated:

1. Although this indicates that the jury left the room at this point, it becomes clear based upon later comments by both the judge and defense counsel that the bailiff restrained the defendant and placed his hand over Vaughn's mouth in the presence of the jury.

All right. At the break, Mr. Holcomb, you asked a question, the answer was non responsive, the Court felt it necessary to stop the testimony as to the non responsive nature of the question. The Court has explained the expectations of what it has for the defendant at the break. Mr. Holcomb, will you ask your question again, please.

*Id.* at 346. Holcomb then asked Vaughn, "Mr. Vaughn, do you have anything to say to the jury with regard to the events of September the 5th, 2008, with regards to you being in custody?" *Id.* Vaughn answered the question with no further problems. After Vaughn completed his testimony, *id.* at 346–383, the jury retired to the jury room. At this point, Attorney Holcomb

move[d] for a mistrial due [to] the activities of what happened when my client ... was restrained by the bailiffs in this court in front of the jury. And then the jury was sent out. While my client was rambling and insisting on attacking me verbally while he was on the witness stand, at that point he was in no way, shape, form, or fashion being abusive towards the jury or any kind of a physical threat.

So on the one hand I suppose, even though the Court may feel that Mr. Vaughn was trying to set up a situation for mistrial to be granted, I don't think it was necessary to have him physically restrained at that point simply because he wouldn't shut up when the Court told him to be quiet. He was obviously mentioning matters that should not have been brought within the purview of the jury and would not be quiet when the Court instructed him to be quiet. But I don't believe it was necessary at that point to have restrained him physically. Although he may have invited this thing intentionally.

*Id.* at 384–85. The State's only response was that "the actions taken by the bailiffs were in ... accordance with court procedure when the defendant blatantly disregarded every command you gave him." *Id.* at 385. For purposes of creating a record for the appellate court, the trial court summarized how many times Vaughn had wavered about proceeding pro se and opined that Vaughn, by criticizing Attorney Holcomb on the stand, was "trying to somehow create error, appealable error, reversible error, or a mistrial in this cause even though he filed a Motion for a Speedy Trial." *Id.* at 388. The trial court recalled the situation as follows:

When the defendant started to give a non responsive answer to Mr. Holcomb's very clearly open ended question, which invited the defendant to give his version of the events, as I recall the situation, I told him to be quiet or something to that effect and thereafter, I think I might have even told him to shut up. But at least on two occasions I believe that I had tried to stop the proceedings to bring them back into order.

At the point that it became clear to me that the defendant was not going to stop talking, I called the court staff in. Immediately upon Mr. Kelley coming into the courtroom, as I observed, Mr. Kelley then told him to be quiet at least once, maybe another time, at which point he did not stop talking. At which point I believe I commanded Mr. Kelley to put his hand over the defendant's mouth.

That situation is an unfortunate situation and something that I never intended to have occur in front of this jury. But nevertheless based on what I observed, I don't feel that this Court caused that to occur.

\* \* \* \* \* \*

So having said all of that, while it was an unfortunate situation that occurred before the jury, it is not something that this Court caused. And the Motion for Mistrial is denied.

*Id.* at 388–90.

The jury found Vaughn guilty as charged. The trial court entered judgment of conviction as to Class C felony robbery and Class D felony resisting law enforcement only. The court sentenced Vaughn to six years for the Class C felony and two years for the Class D felony, to be served consecutively. This belated appeal now ensues.

### Discussion and Decision

■■■ Vaughn contends that the trial court erred in denying his motion for mistrial. The ruling on a motion for a mistrial is left to the sound discretion of the trial court as that court is in the best position to assess the circumstances of an error and its probable impact upon the jury. *Stokes v. State,* 922 N.E.2d 758, 762 (Ind.Ct.App. 2010), *trans. denied.* We reverse only upon an abuse of that discretion. *Id.* To prevail on appeal from the denial of a motion for mistrial, the defendant must demonstrate that the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. *Id.* at 762–63. The gravity of the peril is assessed by the probable persuasive effect of the misconduct upon the jury's decision rather than upon the degree of impropriety of the conduct. *Id.* at 763. A mistrial is an extreme remedy that is justified only when less severe rem-

edies will not satisfactorily correct the error. *Id.*

As an initial matter, the State argues that Vaughn's motion for mistrial was untimely because it came at the completion of his testimony rather than when he was restrained and had a hand placed over his mouth. However, we find that his motion was sufficiently timely. Importantly, we note that the trial court addressed Vaughn's motion at trial. Therefore, we find that it is not waived for appeal and proceed to the merits.[2]

■■■ A defendant has the right to appear in front of a jury without physical restraints, unless such restraints are necessary to prevent the defendant's escape, protect those in the courtroom, or maintain order during trial. *Wrinkles v. State,* 749 N.E.2d 1179, 1193 (Ind.2001); *see also Kocielko v. State,* 938 N.E.2d 243, 251 (Ind. Ct.App.2010) (noting that generally, a defendant may not be presented to the jury in handcuffs or shackles), *reh'g granted in part,* 943 N.E.2d 1282 (Ind.Ct.App.2011), *trans. denied.* "This right springs from the basic principle of American jurisprudence that a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt." *Wrinkles,* 749 N.E.2d at 1193. For this presumption to be effective, trial courts must guard against practices that unnecessarily mark the defendant as a dangerous character or suggest that his guilt is a foregone conclusion. *Id.; see also Stephenson v. State,* 864 N.E.2d 1022, 1029 (Ind.2007) ("[V]isible shackling undermines the presumption of innocence and the related fairness of the fact-finding process" and "impair[s] the

---

**2.** The State also argues that Vaughn has waived this issue because he failed to request an admonishment. The State, however, cites the line of cases setting forth the standard for prosecutorial misconduct. That line of cases says that the failure to request an admonish-

ment *or* move for mistrial results in waiver of the issue. *See, e.g., Cooper v. State,* 854 N.E.2d 831, 836 (Ind.2006). Given the extreme measures used here and the potential for fundamental error, we find no waiver on this ground.

dignity of the judicial process." (quotation omitted)), *reh'g denied.* Accordingly, the facts and reasoning supporting the trial court's determination that restraints are necessary must be placed on the record. *Wrinkles*, 749 N.E.2d at 1193.

Typical methods of restraint include handcuffs, shackles, security chairs, and gagging a defendant. *Id.; see also Illinois v. Allen*, 397 U.S. 337, 343–44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ("We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant ...:(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; [and] (3) take him out of the courtroom until he promises to conduct himself properly.").

■ Here, there was only one disruption of courtroom decorum by Vaughn. That is, when Attorney Holcomb asked Vaughn the open-ended question, Vaughn responded "I ask you to argue something and you didn't argue it" instead of discussing the September 5, 2008, incident. The trial court told Vaughn to stop, but Vaughn did not stop and instead tried to get his point across. The entire incident likely transpired in a matter of seconds. On appeal, the State characterizes Vaughn's conduct as "castigat[ing]" his attorney, a "tirade," and a "continuing harangue against his attorney." Appellant's Br. p. 4, 7, 10. We think this characterization goes too far. Similarly, we think the trial court's actions in having Vaughn restrained and placing a hand over his mouth in front of the jury go too far as well.

While we understand the trial court's frustration, it overreacted to Vaughn's one-time outburst in front of the jury. Evidently frustration had been brewing, because Vaughn had been unable to make a decision on whether to represent himself. Importantly, through all of Vaughn's indecision, up to that point he had not broken courtroom decorum in any of the proceedings either before the court or the jury.

The State calls our attention to *Avant v. State*, where the defendant appeared in front of the jury with his mouth taped shut. 528 N.E.2d 74, 77 (Ind.1988). In that case, after the State's first witness testified, the defendant became upset and disrupted the trial proceedings. *Id.* He complained that his attorney had not sufficiently questioned the witness and requested a new attorney. *Id.* The defendant refused to remain quiet. *Id.* The trial judge excused the jury and again asked the defendant to remain quiet. *Id.* Following a recess, the defendant again interrupted the proceedings in the jury's presence. *Id.* The judge excused the jury. *Id.* The judge spoke with the defendant again, and he said he was not going to remain quiet. *Id.* So the judge ordered her deputies to tape the defendant's mouth shut. *Id.* Despite the fact that his mouth was taped shut, the defendant managed to disrupt the proceedings again on two occasions. *Id.* The judge told the defendant that if he was willing to be silent she would have the tape removed, but he indicated that he would not stay silent. *Id.* Accordingly, his mouth remained taped shut for the duration of the trial. *Id.* It also appears that his hands were tied to keep him from removing the tape. *Id.*

The defendant moved for a mistrial, which was denied. *Id.* Our Supreme Court warned that "[t]hese extreme measures should only be used as a last resort after examining all the alternatives." *Id.* The Court concluded that the defendant's

> disruptions created sufficient provocation to justify the use of physical restraint. By his refusal to cooperate and remain civil, [he] forced the trial judge to employ means necessary to maintain control of her courtroom in order that the trial proceed. [She] was justified in

employing extreme measures to deal with an extremely recalcitrant defendant. A defendant who creates his own cause for mistrial presents no error.

*Id.* at 77–78.

██ This case is not on par with *Avant.* Vaughn's one-time disruption did not create sufficient provocation to justify restraining Vaughn in front of the jury. His non-responsive answer to Attorney Holcomb's open-ended question and subsequent efforts in trying to make his point—despite the trial court telling him to "Stop"—do not rise to the level of the court's "extreme measures" of restraining him and having court staff place a hand over his mouth in front of the jury. Put differently, the punishment was out of proportion to Vaughn's offense, as the trial court put it, of being "non responsive." Tr. p. 346. Though these were temporary measures, the damage was permanent. And while Vaughn may have technically created the situation, there were less extreme measures that the trial court could have employed, such as warning Vaughn of the potential consequences or merely excusing the jury. Tellingly, when the trial court did speak to Vaughn about his actions after this incident, Vaughn testified and then remained in the courtroom for the remainder of the proceedings without incident. Although we recognize the volume of evidence against Vaughn, he is entitled to a fair trial. We therefore conclude that this event was so prejudicial that Vaughn was placed in a position of grave peril to which he should not have been subjected. The probable persuasive effect on the jury is undeniable. It marked Vaughn, who was on trial for robbing a bank, as a dangerous person who needed to be restrained and suggested that his guilt was a foregone conclusion.

We understand the difficulty of being a trial judge and making decisions in the flash of a moment. We realize that it sometimes takes superhuman effort to restrain the natural frustration of dealing with difficult people at challenging times. We also recognize that this action is totally out of character for this seasoned and fine trial court judge. But we also understand the influence of a judge's conduct on the jury. Muzzling and restraining Vaughn in front of the jury for this momentary outburst deprived him of an otherwise fair trial before an untainted and impartial jury. Accordingly, we conclude that the trial court abused its discretion in denying Vaughn's motion for mistrial. We therefore reverse and remand for a new trial.

Reversed and remanded.

DARDEN, J., concurs.

FRIEDLANDER, J., dissents with separate opinion.

FRIEDLANDER, Judge, dissenting.

I do not share the Majority's view that the trial court's remedial response to Vaughn's refusal to abide by the court's instructions was reversible error, and therefore respectfully dissent.

The Majority notes that Vaughn had flip-flopped (the trial court termed it "flim-flamming" or "flimflamming back and forth") on several occasions about his intention to represent himself at trial. *Transcript* at 11, 342, respectively. Indeed, a review of the record reveals that Vaughn originally was represented by counsel before deciding to proceed pro se some months before trial. About a week before trial was to commence, he changed his mind again and requested counsel. Counsel was appointed. On the Friday before trial was to commence on Monday, Vaughn submitted another motion to proceed pro se. The court addressed that motion at the outset of proceedings on Monday and even at that late date,

Vaughn continued to vacillate back and forth as to whether he would represent himself. As they discussed the motion, Vaughn changed course and indicated he had once again decided to accept the public defender's services. Then he changed his mind abruptly at the end of the same discussion and again expressed a preference to proceed pro se. After the court recited the customary warnings about the perils of self-representation and they were about to proceed to jury selection, Vaughn again began vacillating and asked for a moment to confer with counsel. After a ten-minute discussion between the two, Vaughn changed his mind again and decided to proceed to trial represented by counsel.

That lasted until the jury was impaneled and opening statements were finished. When the court asked Vaughn's attorney if he was ready to proceed, counsel responded:

> We are not, Your Honor, there are matters that need to be addressed. ... After speaking with my client here, apparently he is entertaining notions of going pro se. So I know we have been back and forth with that before, but I think it is my duty to advise the Court.

*Id.* at 54–55. After the court and Vaughn discussed the matter, Vaughn again expressed a desire to proceed pro se. The court denied this request, stating:

> The defendant's request to proceed pro say [sic] is denied because the defendant has not made an unequivocal decision to proceed pro se and in fact, he changes his mind on a repetitive basis. The Court does not know what his motivations for doing that are, however, it is my personal feeling and belief, having done this for a number of years, involved in the criminal justice system that if I allowed him to proceed pro se today, tomorrow he will come in and tell

me that he wants his lawyer back. Also, in his motion filed October 31, he did not make an unequivocal motion to proceed pro se, because in that motion, he indicated that he wanted somebody to help him with jury selection. Bring in the jury.

*Id.* at 66. When the judge returned to the courtroom following a lunch break on the second day of trial, he found in his chair a written motion to proceed pro se that, unbeknownst to defense counsel, had been placed there by Vaughn. The motion, which the trial court read into the record, detailed the grounds for Vaughn's request, as follows:

> Comes now the defendant, Kenneth Vaughn, and motions this Honorable Court of Lake County to allow him to proceed pro se. I know that I pulled out my last motion, but I didn't know what I know now. Maurice Burge, a witness in this case, was going to testify on my behalf and says that my public defender, Noah Holcomb, approached him prior to the start of my jury selection and tried to persuade him to leave. Mr. Burge states that Mr. Holcomb called him "crazy" and tried to tell him not to testify on my behalf because of past events. Mr. Burge testified against me in 2006, he was the victim of the crime I was convicted on [sic]. He says Mr. Holcomb told him he shouldn't testify for me because I tried to kill him. Mr. Holcomb also got into verbal disagreement with me because I asked him why he didn't give an opening statement and he told me, "I'm not paying him, so I can't tell him how to fight this case". I really do mean this when I say I'm not comfortable with Mr. Holcomb being my attorney. Please grant me this Motion as a citizen of the United States. I have the right to cross examine any and every witness that the State may won't [sic] to

have present to testify against me and I elect to act on that right, because it's not a privilege, it's a right that I have. Sorry for the inconvenience, but I won't [sic] to finish this trial on my on [sic]. *Id.* at 147–48. After the trial court denied Vaughn's motion, defense counsel pointed out to the court that among the materials Vaughn brought to court, he had placed a white envelope marked, "Supreme Court Disciplinary Commission" that Vaughn "refused to let [counsel] pick up from the table." *Id.* at 157. To counsel, the implication was obvious.

At this point it would be helpful to expand upon the source of Vaughn's displeasure with his appointed counsel, at least the displeasure that was manifest approximately one week before trial and continued through trial. Vaughn alluded to the problem in his lunchtime motion to proceed pro se, i.e., potential witness Maurice Burge. Vaughn denied involvement in the robbery from which his charges stemmed. To bolster his denial, he proposed to call Burge, who Vaughn claimed would provide what amounted to alibi evidence. That is, Burge would testify that he had personally briefly spoken to Vaughn at 9 or 9:30 a.m.[3] on the day of the robbery. The evidence revealed that the robbery occurred approximately 10 minutes later, from 9:39 to 9:43 a.m. The record does not reveal where Burge's supposed encounter with Vaughn took place, but presumably it was in close enough proximity to the site of the robbery that it did not conclusively establish that Vaughn could not have been at the scene of the robbery some ten minutes later.

But that may not have been the only problem with Burge's testimony, according to attorney Holcomb.[4] As indicated in Vaughn's lunchtime motion to proceed pro se, Vaughn first became acquainted with Burge when Burge was the victim of a previous crime of which Vaughn eventually was convicted. Defense counsel believed that Burge's testimony would be more harmful than beneficial for Vaughn, perhaps because of the possibility that the prior conviction might come to the jury's attention through Burge's testimony. In any event, in defense counsel's judgment, Burge's testimony would serve no useful purpose, i.e., "[n]ow when I talked with Mr. Burge on Monday, Mr. Burge has indicated on, I think four other occasions [he] had nothing of any significance to add to this case that ... would have helped Mr. Vaughn in this case." *Id.* at 395.

It is against this factual backdrop that we must consider the actions of which Vaughn now complains. In concluding that the trial court essentially over-reacted (i.e., "[t]hese restraints went far beyond what was necessary to maintain order," *op.* at 488) the Majority states that the provocation "was only one incident by Vaughn." *Id.* I believe this mischaracterizes what

3. Evidently, Burge originally told an investigator from the Public Defender's office that the two met at 9 a.m., but Burge told Vaughn's counsel that he (Burge) "had seen [Vaughn] about 9:30 [on the morning of the robbery] and then they parted." *Id.* at 245.

4. I note also that trial commenced on Monday, continued on Wednesday, and concluded on Thursday. Vaughn asked Burge to attend on Monday, and Burge obliged. By the end of the day, however, the trial had proceeded only to the point of opening statements. As set out previously, Vaughn had indicated that he wanted to call Burge as a witness. As this was the first time the State had heard of Burge, the State served him with subpoena on Monday to appear the following morning for deposition. Burge did not appear. Apparently, Vaughn thereafter spoke with Burge on Tuesday and then again on Wednesday, and asked him on both occasions to attend trial the following day. Vaughn claimed Burge indicated both times that he would attend the next day, but Burge failed to do so.

occurred. First, as set out in detail above, Vaughn had from the outset of trial, and indeed before, vacillated back and forth on the question of whether to proceed pro se. He had done so ostensibly because he stubbornly clung to the notion that (1) Burge would testify on his behalf and (2) such testimony would be relevant and helpful to his case. This was a running theme throughout the trial. Second, this "one incident" was in fact comprised of several successive, blatant refusals by Vaughn to adhere to the court's commands to stop talking. Considering all that had gone on the previous three days, the court reasonably could have believed that further commands to stop talking would also go unheeded.

A trial court has the right, and indeed the duty, "to manage the proceedings and take responsible steps to ensure that proper discipline and order exist in the courtroom." *Mengon v. State*, 505 N.E.2d 788, 792 (Ind.1987). To accomplish this, the court may go so far as to order that a defendant be shackled and gagged. *See Wrinkles v. State*, 749 N.E.2d 1179 (Ind. 2001). The Majority rejects *Avant v. State*, 528 N.E.2d 74 (Ind.1988) as guiding authority in this case, largely, it seems, because the *Avant* defendant's trial misconduct was open and persistent—i.e., it was more egregious. I agree that the *Avant* defendant was more brazen than Vaughn about his intention to disrupt the proceedings and he did it more often. I am not ready, however, to say that the principles enunciated in *Avant* for dealing with non-cooperative or disruptive defendants are limited in application only to situations where, compared to the *Avant* defendant, a defendant displays equal or greater recalcitrance. Rather, I interpret it to mean that a trial court is permitted to go so far as tape the defendant's mouth shut if the situation warrants it. I understand that the Supreme Court cautioned that the use of tape was an extreme measure that, though justified on the facts of *Avant,* would not be routinely acceptable. I believe Vaughn's misconduct was not nearly as egregious as was the *Avant* defendant's, but neither was the trial court's remedial action in the instant case as severe. In fact, I believe the trial court's response in the instant case was appropriate and therefore sanctioned by *Avant.*

Not only did Vaughn ignore repeated orders to stop talking,[5] but it appears the trial court also was justifiably concerned that Vaughn was about to make statements that might cause a mistrial. To prevent that, and to maintain order, the court decided that Vaughn need to be silenced immediately—and reasonably so, in my view. Could the court have chosen a less "extreme" means of doing so? First and foremost, we cannot ignore the context in which this situation arose. The Majority describes it as "only one incident by

---

5. As the Majority notes, the trial court indicated that the bailiff's actions were necessary because Vaughn answered a question in a manner that was "non responsive" [sic]". *Transcript* at 346. The Majority quotes this language in stating its conclusion that the remedial measures ordered by the trial court were out of proportion to Vaughn's conduct, viz., clamping a hand over the defendant's mouth was too heavy-handed a remedy for merely providing a nonresponsive answer. It must be remembered, however, that the trial court's description of the precipitating incident that is quoted by the Majority was part of the very brief remarks addressed to the jury by the trial court upon the jury's return to the courtroom following the incident. No doubt, the trial court was understandably motivated to downplay the incident to minimize any prejudicial impact it might have on the jury. In any event, I believe that the description, "provided a nonresponsive answer" sanitizes the nature of Vaughn's behavior in this instance, especially for purposes of considering the proportionality of the trial court's response.

Vaughn." *Op.* at 488. I suppose this is true in a technical sense, but to view this incident in isolation is to ignore all that led up to it, as described in detail above. Isolated from its context in this fashion, our evaluation of the trial court's decision is hamstrung by a lack of perspective. For instance, absent a consideration of that context, we cannot accurately determine the likelihood that Vaughn would have continued to disregard the trial court's directives and would have said something that would result in a mistrial. Taking into consideration all that had occurred up to that point, it appears to me that Vaughn was determined to say what he was going to say,[6] and he no longer recognized the trial court's authority to limit his testimony. Thus, the trial court was left with only two choices: force Vaughn to stop talking or force the jury to stop listening. As to the latter, it is not clear to me how the trial court could accomplish it even if it were so inclined, at least not in a manner befitting the standards of decorum appropriate to the proceedings. This left only one option—to physically prevent Vaughn from speaking.

Ultimately, the Majority decides that clamping a hand over Vaughn's mouth and restraining him "marked [him] … as a dangerous person and suggested that his guilt was a foregone conclusion." *Op.* at 489. It seems far more likely that the jury would conclude the restraints were placed there for a different reason—the *actual* reason, i.e., Vaughn refused to obey the court's orders to stop talking. Surely restraints do not carry the stigma of guilt when the jury has seen first-hand that they were placed there as a result of the defendant's *courtroom* behavior. This is especially so where the defendant was restrained only briefly and the jury was advised by the trial court that the restraints had been removed after "[t]he Court … explained the expectations of what is has for the defendant[.]" *Transcript* at 346. I cannot see how the stigma of guilt would arise with respect to the underlying charge under these circumstances.

I find one other implication of the Majority's ruling troubling. Certain of Vaughn's actions both before and during trial led both the trial court[7] *and* defense counsel[8] to believe that he may have been attempting all along to cause a mistrial. Those opinions were not without basis in the record. One of our sister courts has observed that "[t]he administration of criminal justice is not to be delivered into the hands of those who gain only from its subversion." *State v. Guy,* 82 N.M. 483, 483 P.2d 1323 (N.M.Ct.App.1971). To the

---

6. Indeed, this was explicitly a basis for the trial court restraining Vaughn as it did. When explaining its denial of Vaughn's motion for mistrial, the court stated,

    I told him to be quiet or something to that effect and thereafter, I think I might have even told him to shut up. But at least on two occasions I believe that I had tried to stop the proceedings to bring them back into order. At the point that it became clear to me that the defendant was not going to stop talking, I called the court staff in.

    *Transcript* at 388.

7. After the jury was removed following the courtroom incident under discussion, the court stated to Vaughn: "I think you're trying to intentionally cause a mistrial, Mr. Vaughn. And you have been since the beginning. I have been patient with you, but I am not going to let you make a mockery out [of] this system, which is exactly what you're trying to do." *Id.* at 339.

8. When discussing the motion to proceed pro se submitted during trial, defense counsel stated: "I still have my job to do and I have my professional reputation to uphold. So it will not bother me one way or the other. What I surmise here is Mr. Vaughn is doing his best to create reversible error here[.]" *Id.* at 159.

extent there was any prejudice to Vaughn as a result of the actions undertaken to compel his silence, he brought it on himself, perhaps purposely. Whether purposeful or not, he should not be permitted to gain from his willful disregard of the trial court's commands. I would affirm the trial court in all respects.