**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Mar 14 2014, 10:18 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PAUL J. WALLACE**
**ROBERT W. ROCK**
Jones Wallace, LLC

ATTORNEY FOR APPELLEE:

**PATRICK A. SHOULDERS**
**ROBERT L. BURKART**
**RHETT D. GONTERMAN**
Ziemer Stayman Weitzel
& Shoulders, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BEVERLY K. OSWALD, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1305-CC-223 |
| | ) | |
| CNB NATIONAL LENDING, LLC, BRYCE A. BLY, ERIC SWEDENBURG and ANDREA SWEDENBURG, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Carl A. Heldt, Judge
Cause No. 82C01-1202-CC-85

**March 14, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Plaintiff, Beverly K. Oswald (Oswald), appeals the trial court's Order in favor of Appellees-Defendants, CNB National Lending LLC (CNB), Bryce A. Bly (Bryce), Eric Swedenburg (Eric), and Andrea Swedenburg (Andrea) (collectively, Appellees), concluding that Appellees did not breach the Settlement and Release Agreement and the trial court's separate award of attorney fees to Appellees.

We affirm.

## ISSUES

Oswald raises four issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court erred by concluding that Appellees did not breach the Settlement and Release Agreement; and

(2) Whether the trial court properly awarded attorney fees to Appellees.

## FACTS AND PROCEDURAL HISTORY

CNB was an Indiana limited liability company, incorporated in April 2008, with its principal place of business in Vanderburgh County, Indiana. The company was in the business of providing wholesale consumer mortgage loan services on United States Department of Agriculture (USDA) loans originated by licensed mortgage lenders. Because CNB was not a licensed mortgage lender, it needed a licensed loan partner in order to conduct business.

Prior to December 21, 2010, CNB consisted of three equal members, Oswald, Andrea, and Bryce, who each held a one-third ownership in the company. Eric was not a

2

member; rather, he was an employee of CNB. In December 2010, the parties entered into a Settlement and Release Agreement (Agreement) to resolve certain internal disputes. In the Agreement, CNB agreed to pay Oswald $350,000, with $15,000 upon execution and the remaining balance in monthly installments, in exchange for Oswald assigning her one-third interest to CNB. In the Agreement, the two remaining members, Bryce and Andrea, agreed

> that they shall not shut down, dissolve, bankrupt or cease the operations of CNB for the purpose of having CNB avoid its payment obligation to Oswald hereunder. Such agreement shall not, however, preclude any action by CNB if there is a material negative change in the legal or regulatory affairs affecting CNB or other material negative change in the market serviced by CNB which materially impairs CNB's going status or profitability.

(Tr. Exh. 2). At the same time, CNB executed a Promissory Note (Note) to the order of Oswald in the amount of $335,000 to acquire Oswald's one-third interest in CNB.

During the course of its business, CNB had one primary business partner, Citizens National Bank of Paris, Illinois (Citizens Bank), to which it provided its lending services. Citizens Bank was licensed in all states and most of CNB's loan servicing and revenue derived from Citizens Bank loans originating in New York, Nevada, California, Arizona, and Florida. By August 2011, Citizens Bank was CNB's sole client and responsible for 100% of its revenue. However, that same month, CNB received notice from Citizens Bank that it would cease its business relationship with CNB after September 2011. As a result, CNB's loan servicing volume decreased over 50%, leading to a loss of revenue of 60%, a decrease in Appellees' salaries, and a strain on operations and finances. Multiple employees were laid off.

3

After losing Citizens Bank, CNB attempted to find other lending partners and partnered with Mortgage Services III, LLC (MSI) and Premier Home Mortgage (Premier). Because MSI and Premier had more conservative lending practices and were not licensed in New York, California, Nevada, Florida, and Arizona, CNB received a lower loan servicing volume than in the past. No other partners could be secured, nor did CNB successfully obtain bank financing to aid with its financial problems.

Prior to losing Citizens Bank as its lending partner, CNB had paid Oswald monthly in accordance with the provisions of the Note. However, after ceasing business operations with Citizens Bank and its resulting loss in revenue, CNB had insufficient financing available to timely pay all its creditors, including its state and federal tax obligations. In December of 2011, CNB advised Oswald of its financial problems and requested an accommodation on the Note. On January 3, 2012, Oswald gave notice of default under the Note and threatened with litigation. On January 12, 2012, MSI advised CNB that it would be terminating its relationship with CNB because CNB was also doing business with Premier, MSI's competitor.

On February 17, 2012, Oswald filed a Complaint seeking to enforce the Agreement and judgment against CNB on the Note. In her Complaint, Oswald specifically contended that there had been no material negative change in the market serviced by CNB or in the market's legal or regulatory affairs justifying an avoidance of its payment obligation under the Note.

Thereafter, on February 24, 2012, Bryce and Andrea passed a resolution dissolving CNB. In winding up its affairs, CNB assigned its delinquent office lease to

Premier and sold its equipment to Premier at fair value, the proceeds of which were used to pay CNB's delinquent state and federal taxes. On April 1, 2012, Andrea, Bryce, and Eric commenced employment with Premier. On April 16, 2012, CNB was officially dissolved.

On January 14, 2013, the trial court conducted a bench trial. After both parties filed their respective proposed findings of fact and conclusions of law, on March 6, 2013, Appellees also filed an affidavit in support of attorney fees. On April 1, 2013, the trial court issued its findings of fact and conclusions of law concluding that because Oswald "failed to carry her burden of proof with respect to the claims asserted[,]"Appellees did not breach the Agreement. (Appellant's App. p. 34). On May 3, 2013, the trial court conducted a hearing on Appellees' motion for attorney fees. On May 8, 2013, over Oswald's objection, the trial court awarded Appellees attorney fees in the amount of $75,511.93.

Oswald now appeals. Additional facts will be provided as necessary.

<u>DISCUSSION AND DECISION</u>

I. *The Agreement*

A. *Standard of Review*

In the present case, the trial court *sua sponte* entered findings of fact and conclusions of law[1]. When the trial court enters such findings *sua sponte*, the specific

---

[1] It should be noted that the trial court adopted *verbatim* Appellees' proposed findings of fact and conclusions of law. When the trial court signs the findings of fact and conclusions of law, they become the court's findings of fact and conclusions of law. *Tri-City Plaza Bowl v. Estate of Glueck*, 422 N.E.2d 670, 674 (Ind. Ct. App. 1981). The trial court is responsible for their correctness. *Id*. These findings of fact and conclusions of law are not weakened because they are adopted *verbatim*. *Id*. If the proposed

5

findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found. *Scoleri v. Scoleri*, 799 N.E.2d 1211, 1215 (Ind. Ct. App. 2002). In reviewing the judgment, this court must determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* We will reverse a judgment only when it is shown to be erroneous, *i.e.*, when the judgment is unsupported by the findings of fact and conclusions entered on the findings. *Id.* For findings of fact to be clearly erroneous, the record must lack probative evidence or reasonable inferences from the evidence to support them. *Id.* In determining the validity of the findings or judgment, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom, and we will not reweigh the evidence or assess the credibility of witnesses. *Id.* Finally, a general judgment may be affirmed on any theory supported by the evidence presented at trial. *Id.*

### B. *Analysis[2]*

To prevail on a breach of contract, the plaintiff must show the existence of a contract, the defendant's breach of that contract, and damages. *U.S. Fidelity and Guar.*

---

findings of fact and conclusions of law did not state the facts as the trial court found them to be, it would not have adopted them as its own. *Id.* These findings will not be set aside unless clearly erroneous. *Id.* Although our supreme court did not prohibit the practice of wholesale adoption of findings of fact and conclusions of law, it nevertheless indicated that "when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court." *Wrinkles v. State*, 749 N.E.2d 1179, 1188 (Ind. 2001). This is particularly true when the issues in the case turn less on the credibility of witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony. *Id.*

[2] In their Appellees' Brief, Appellees claim that "Eric did not make any representation under the Agreement concerning closure of CNB and therefore, cannot be liable for breach of the Agreement." (Appellees' Br.). Although the disputed Article in the Agreement only appears to implicate Bryce and Andrea, the record clearly establishes that the Agreement was entered into and executed by and between Oswald, CNB, Bryce, Andrea, and Eric.

6

*Ins. Co. v. Hartson-Kennedy Cabinet Top Co., Inc.*, 857 N.E.2d 1033, 1039 (Ind. Ct. App. 2006). The party asserting a breach of contract bears the burden of proof. *Indiana-American Water Co., Inc. v. Town of Seelyville*, 698 N.E.2d 1255, 1258 (Ind. Ct. App. 1998). Not disputing the existence of a contract and damages, the parties solely focus on whether a breach of the Agreement's terms occurred. In this light, Article 1 of the Agreement specifies when a breach might occur and provides that

> [Bryce] and [Andrea] further agree that they shall not shut down, dissolve, bankrupt or cease the operations of CNB for the purpose of having CNB avoid its payment obligation to Oswald hereunder. Such agreement shall not, however, preclude any action by CNB if there is a material negative change in the legal or regulatory affairs affecting CNB or other material negative change in the market serviced by CNB which materially impairs CNB's going status or profitability.

(Tr. Exh. 2). In an overarching contention, Oswald asserts that the trial court erred when it concluded that Appellees "did not breach the Agreement by closing CNB." (Appellant's App. p. 33). She maintains that considering the "clear motivation of" Appellees and their resentment to pay Oswald for her interest in CNB, it is clear that Appellees "dissolved CNB in violation of the [Agreement] in order to avoid the debt owed to Oswald," and thus breached the Agreement. (Appellant's Br. p. 14).

However, the evidence supports that at the time of filing the Complaint, on February 17, 2012, CNB had merely ceased payment on the Note; it had not yet dissolved or ceased operations, which only occurred on February 24, 2012. Therefore, in her Complaint, Oswald specifically focused on the material negative change, included in section 2 of Article 1, as the basis of her claim. Although both parties discussed the closing of CNB at trial, Oswald had never amended her Complaint to reflect this changed

7

situation and thus carried the burden to establish that CNB's "action" of non-payment on the Note was not derived from a material negative change which materially impaired CNB's going status or profitability.

While Oswald concedes that CNB experienced financial problems after losing Citizens Bank as a lending partner, she asserts that the members' ability to pay themselves excessive salaries, the fact that CNB continued to have significant value, and that no change occurred to the USDA lending program, indicates the absence of a material negative change either in the legal regulatory affairs or in the market serviced by CNB. We disagree.

Although the parties do not dispute the "action" taken within the confines of the second part of Article 1, their main dispute centers on the "material negative change" language which remains undefined in the Agreement. When interpreting a contract, the contract must be read as a whole, and the court should accept an interpretation of the contract that harmonizes its provisions. *Indiana Gaming L.P. v. Blevins*, 724 N.E.2d 274 (Ind. Ct. App. 2000), *trans. denied*. We should make every effort to avoid a construction of contractual language that renders any words, phrases, or terms ineffective or meaningless. *Id*. Courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions. *Id*.

The parties agree that between CNB's inception and its dissolution, no regulations were adopted affecting or amending the USDA mortgage loan market. It is also undisputed that CNB was an unlicensed mortgage lender who relied on a licensed loan

8

partner to originate business in order to provide wholesale consumer mortgage loan services on USDA loans. During the course of its business, CNB retained Citizens Bank as its primary and sole lending partner. Because Citizens Bank operated under more aggressive lending conditions and was licensed in forty-eight states, including the key states of New York, Nevada, California, Arizona, and Florida, CNB's business was thriving. The record supports and the trial court found that after September 2011, when Citizens Bank ceased using CNB's loan services, the company's loan servicing volume decreased over 50%, and its corresponding revenue decreased by 60%. Because the market serviced by CNB necessarily equates to the market serviced by CNB's business partner due to CNB's unlicensed status, it necessarily follows that when its sole business partner disappeared, CNB's market became non-existent. Although the evidence establishes that CNB partnered with other licensed lending partners, CNB's loan servicing volume was severely diminished. The trial court found that as result of the loss of Citizens Bank and the decrease in revenue, CNB terminated multiple employees and decreased the pay for Bryce and Andrea.

Nevertheless, in an attempt to dispel the negative material change which affected CNB's profitability, Oswald claims that, after losing Citizens Bank as its sole partner, Appellees mismanaged CNB by continuing to draw excessive salaries. Initially, we hasten to point out that the Agreement does not specify or prohibit perceived excessive salaries to be paid to CNB's members. Similarly, the Agreement does not require that payment to Oswald be made prior to CNB's members or employees being paid. Moreover, the evidence presented reflects that the salaries Oswald challenged at trial

from November 2011 to March 2012 were substantially less than what Bryce and Andrea were paid during the months in 2010-2011 that Oswald does not dispute. Based on this evidence, the trial court found that the "compensation of Bryce and Andrea decreased by almost 60%." (Appellant's App. p. 31).

As a result of losing its sole business partner in September of 2011, CNB, as an unlicensed lender, experienced a material negative decline in its servicing market. Despite the fact that CNB attempted to find other business partners, its revenue decreased more than 60%, leading to insufficient finances to pay its debts and its profitability became materially impaired. As a result, CNB could take "any action," including stopping payment on the Note, pursuant to section 2 of Article 1 of the Agreement. (Tr. Exh. 2). Therefore, we decline to disturb the trial court's conclusion that Oswald "failed to carry her burden of proof with respect to the claims asserted against Bryce, Eric and Andrea." (Appellant's App. p. 34).

## II. *Attorney Fees*

Next, Oswald contends that trial court erred when it awarded attorney fees to Appellees. She maintains that "[Bryce], Andrea, and Eric should not have been awarded attorney fees because the [Appellees] materially breached the [Agreement] and the Note." (Appellant's Br. p. 27).

Article 15 of the Agreement provides:

In the event any party files suit to enforce the terms of this Agreement, the prevailing party or parties, as determined by said court, shall be entitled to an award of its reasonable attorney fees and expenses in addition to any other relief granted by the court.

10

(Tr. Exh. 2).

In the absence of a definition of "prevailing party" in the contract, we turn to BLACK'S LAW DICTIONARY 1188 (6th ed. 1990) which defines the term as

> [t]he party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention. The one in whose favor the decision or verdict is rendered and judgment entered.

As such, this definition contemplates a trial on the merits and entry of a favorable judgment in order to obtain prevailing party status. *Reuille v. E.E. Brandenberger Const., Inc*., 888 N.E.2d 770, 771-72 (Ind. 2008).

Here, Appellees successfully defended against Oswald's claims before the trial court and were awarded attorney fees. Because we affirm the trial court's order, we must necessarily also affirm the trial court's award of attorney fees to Appellees as the prevailing party.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly concluded that Appellees did not breach the Agreement and properly awarded them attorney fees as the prevailing party.

Affirmed.

VAIDIK, C. J. and MAY, J. concur